**UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| MARK MILLER, MICHELE GANGNES, SCOTT COPELAND, LAURA PALMER, TOM KLEVEN, ANDY PRIOR, AMERICA'S PARTY OF TEXAS, CONSTITUTION PARTY OF TEXAS, GREEN PARTY OF TEXAS and LIBERTARIAN PARTY OF TEXAS, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOHN OR JANE DOE, in his or her official capacity as the Secretary of State of the State of Texas, and JOSE A. "JOE" ESPARZA, in his official capacity as the Deputy Secretary of State of the State of Texas, <br><br> *Defendants*. | Civil No. 1:19-cv-00700 |

## COMPLAINT FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

### INTRODUCTION

1.      For the last 50 years, the State of Texas ("**Texas**") has denied voters their right to cast their votes effectively by enforcing a statutory scheme that guarantees ballot access to the two oldest and largest political parties at taxpayer expense, while imposing ever-greater burdens on their potential competitors.  Most significant among these burdens is the skyrocketing cost of conducting a successful statewide nomination petition drive, which will easily exceed $600,000 in 2020.  This *de facto* financial barrier to participation is all but insurmountable for non-wealthy candidates and parties.  Texas's statutory scheme thus threatens to freeze the political status quo, and imposes severe burdens on the voters, candidates and parties subject to it.  Further, it is not sufficiently tailored to achieve any legitimate or compelling state interest.  Plaintiffs, who are

among the injured parties, therefore bring this action against the Secretary of State of Texas (the "**Secretary**"), in his or her official capacity, to challenge the constitutionality of this statutory scheme. They assert claims for the violation of their rights to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law, as guaranteed by the First and Fourteenth Amendments. Plaintiffs respectfully request that the Court declare the challenged provisions unconstitutional as applied in combination with one another, and permanently enjoin the Secretary from enforcing them.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because the Plaintiffs' claims arise under the First and Fourteenth Amendments to the United States Constitution.

3. This Court has personal jurisdiction over the Defendants because they are officials of Texas, residing in Texas.

4. Venue is proper in this Court because all Plaintiffs are residents of Texas and the Defendants are state officials who maintain an office in Austin, Texas. *See* 28 U.S.C. § 1391(b)(1).

## PARTIES

5. Plaintiff Mark Miller ("**Miller**") resides in Hays County, Texas, where he is registered to vote and intends to remain and vote in future elections. Miller ran for Railroad Commissioner as the Libertarian Party of Texas ("**LPTX**") nominee twice, in 2014 and 2016, and he wants to run for office in future elections in Texas as an independent or nominee of a party that is required to nominate candidates by convention, but the requirements that Texas

imposes upon such candidates chill him from attempting to do so.  Miller seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and he is harmed by the lack of such candidates on Texas's general election ballot.

6.      Plaintiff Michele Gangnes ("**Gangnes**") resides in Lee County, Texas, where she is a registered voter, and intends to remain and vote in future elections.  Gangnes seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and she is harmed by the lack of such candidates on Texas's general election ballot.

7.      Plaintiff Scott Copeland ("**Copeland**") is Chair of the Constitution Party of Texas ("**CPTX**").  He resides in Palo Pinto County, Texas, where he is a registered voter and intends to remain and vote in future elections.  Copeland sought the Constitution Party's nomination for president in 2016, and he intends to run for office as a CPTX nominee in 2020, but he is harmed by the practical impossibility of complying with Texas's ballot access procedures.  Copeland seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and he is harmed by the lack of such candidates on Texas's general election ballot.  Copeland is also harmed by the burden and expense that Texas's statutory scheme imposes on CPTX, which diminishes CPTX's capacity to participate effectively in Texas's electoral process and hinders its ability to grow and develop as a political party.

8.      Plaintiff Laura Palmer ("**Palmer**") is a former Co-Chair of the Green Party of Texas ("**GPTX**").  She resides in Harris County, Texas, where she is a registered voter and intends to remain and vote in future elections.  Palmer seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and she is harmed by the lack of such candidates on Texas's general election ballot.  She is also

harmed by the burden and expense that Texas's statutory scheme imposes on GPTX, which diminishes GPTX's capacity to participate effectively in Texas's electoral process and hinders its ability to grow and develop as a political party.

9.      Plaintiff Thomas E. Kleven ("**Kleven**") resides in Harris County, Texas, where he is registered to vote and intends to vote in future elections.  Kleven seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and he is harmed by the lack of such candidates on Texas's general election ballot.

10.     Plaintiff Andy Prior ("**Prior**") resides in Tarrant County, Texas, where he is registered to vote and intends to vote in future elections.  Prior served as Chair of America's Party of Texas ("**APTX**") from January 2009 until December 2017.  Prior attempted to run for Land Commissioner in 2018 as a nominee of APTX, but APTX lacked the resources necessary to conduct a successful petition drive, and it did not qualify for ballot access.  Prior intends to run for office in future elections in Texas as the nominee of APTX.  Prior seeks to campaign for, speak and associate with, and vote for candidates that must be nominated by convention or nomination petition, and he is harmed by the lack of such candidates on Texas's general election ballot.  Prior is also harmed by the burden and expense that Texas's statutory scheme imposes on APTX, which diminishes APTX's capacity to participate effectively in Texas's electoral process and hinders its ability to grow and develop as a political party.

11.     Plaintiff APTX is the Texas state affiliate of America's Party.  APTX seeks to elect candidates to all levels of office in Texas, but it is unable to qualify for the ballot because it lacks the resources necessary to conduct a successful petition drive.  APTX is injured by the burden and expense that Texas's statutory scheme imposes on APTX, which diminishes its capacity to participate effectively in Texas's electoral process and hinders APTX's ability to grow and develop as a political party.

12.     Plaintiff CPTX is the Texas state affiliate of the Constitution Party.  CPTX seeks to elect candidates at all levels of government in Texas, but it is unable to qualify for the ballot because it lacks the resources necessary to conduct a successful petition drive.  CPTX is injured by the burden and expense that Texas's statutory scheme imposes on CPTX, which diminishes its capacity to participate effectively in Texas's electoral process and hinders CPTX's ability to grow and develop as a political party.

13.     Plaintiff GPTX is the Texas state affiliate of the Green Party of the United States.  GPTX seeks to elect candidates at all levels of government in Texas, but it lacks the resources necessary to conduct a successful petition drive.  GPTX is injured by the burden and expense that Texas's statutory scheme imposes on GPTX, which diminishes its capacity to participate effectively in Texas's electoral process and hinders GPTX's ability to grow and develop as a political party.

14.     Plaintiff LPTX is the Texas state affiliate of the Libertarian Party.  LPTX seeks to elect candidates at all levels of government in Texas, but it lacks the resources necessary to conduct a successful petition drive.  LPTX is injured by the burden and expense that Texas's statutory scheme imposes on LPTX, which diminishes its capacity to participate effectively in Texas's electoral process and hinders LPTX's ability to grow and develop as a political party.

15.     Defendant John or Jane Doe is the Secretary of State of the State of Texas, as the position remains vacant on the date of filing this Complaint.  The Secretary is the State of Texas's chief elections official and is responsible for administering and enforcing the Texas Election Code, including the provisions challenged herein.  The Secretary's business address is Texas Secretary of State – Executive Division, 1100 Congress Ave., Capitol Bldg., Room 1E.8, Austin, Texas 78701.

16.     Defendant Jose A. "Joe" Esparza is the Deputy Secretary of State of Texas.  In the Secretary's absence, the Deputy Secretary shall perform the duties prescribed by law to the Secretary of State.  Tex. Gov't Code § 405.004.

## FACTUAL ALLEGATIONS

**I.    Relevant History of Ballot Access Regulation in Texas**

17.     Texas did not adopt an official state ballot, and therefore did not regulate ballot access until 1903.  *See* 1903 Tex. Gen. Laws, S.H.B. Nos. 45 and 170, Ch. 101.  The original purpose of the official state ballot was not to restrict candidate access, but to protect voter choice by including all candidates on a single ballot, so that voters could make their selections in private booths, free from harassment and intimidation.  Thus, Texas's 1903 law allowed any political party to place its nominees on the ballot if it submitted them to the Secretary by August of the election year.  *See id.* §§ 85-86, 90.

18.     The 1903 law did not provide a method for independent candidates to access the ballot.  Texas amended the law in 1905, to allow independent candidates access if they submitted nomination petitions signed by qualified voters equal in number to "one percent of the entire vote of the State cast at the last preceding general election."  *See* 1908 Tex. Gen. Laws 150 (Terrell Election Law § 94 with amendments through 1908).  The "entire vote" meant the total vote for governor. When that requirement first took effect, in 1906, it translated to 2,802 signatures for statewide office.

19.     Under the 1905 law, parties that polled at least 100,000 votes in the previous gubernatorial election were required to nominate candidates by primary election, and the primary election winners were placed on the general election ballot automatically.  *See id.* §§ 52, 117.

20.     Until 1968, Texas permitted parties that did not qualify to nominate by primary to access the ballot pursuant to the procedure it adopted in 1903 – *i.e.*, by timely submitting a list of their nominees.  In 1968, Texas began requiring such parties to submit nomination petitions and comply with the same 1 percent signature requirement that applied to independent candidates. TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968).  That year, the requirement translated to 14,259 signatures.

21.     Texas originally offset the cost of its primary elections by charging candidates a filing fee, but in 1972 the Supreme Court declared such fees unconstitutional.  *See Bullock v. Carter*, 405 U.S. 134, 149 (1972).  It found that the fees, which ranged as high as $8,900, gave the primary elections "a patently exclusionary character."  *Id.* at 143-45.  Texas thus began using public funds to pay for primary elections in 1972, and has done so ever since.

22.     In 1977, Texas increased the signature requirement for independent candidates for president by changing it from 1 percent of the prior vote for governor, to 1 percent of the prior vote for president (in Texas).  *Compare* TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968) *with* TEX. ELEC. CODE ANN. art. 11.01b (West Supp. 1977).

## II.     Current Ballot Access Requirements under the Texas Election Code

23.     The Texas Election Code currently establishes three separate procedural pathways for those seeking access to its general election ballot:

> **"Primary Parties"** select and place their nominees on the general election ballot by means of taxpayer-funded primary elections, *see* §§ 172.001-173.087 (hereinafter, all statutory citations are to the current Texas Election Code, unless otherwise indicated);
>
> **"Non-Primary Parties"** select their nominees at conventions, but the nominees are not permitted on the general election ballot unless the Non-Primary Party submits precinct convention participant lists and/or nomination petitions signed by the required number of eligible voters, and unless the nominees pay a filing fee or submit nomination petitions, *see* §§ 141.041, 181.001-068;

"**Independents**" are permitted on the general election ballot only if they submit nomination petitions signed by the required number of eligible voters, *see* §§ 142.001-10, 192.032.

As applied, these separate procedures provide Primary Parties guaranteed access to the general election ballot, at taxpayer expense, but allow Independents and Non-Primary Parties access only if they bear the expense of complying with the burdensome and costly procedures described below.

A.    **Texas Guarantees Primary Parties Ballot Access at Taxpayer Expense, and Has Adopted Electronic Procedures to Minimize the Burden Its Statutory Scheme Imposes on Them**

24.    Political parties that received at least 20 percent of the vote in the last gubernatorial election – *i.e.*, Primary Parties – nominate their candidates for state and county government and the United States Congress by primary election. *See* § 172.001. The winners of each primary election race are designated as the party's nominee, and the nominees are placed on the general election ballot. *See* §§ 172.116; 172.117(a); 172.120(a),(h); 172.122. Since at least 1900, only the Democratic Party and Republican Party have qualified as Primary Parties under § 172.001.

25.    The general primary election is held on the first Tuesday in March in each election year. *See* § 41.007(a). Candidates seeking to run in a primary election must submit an application to the state or county chair, depending on the office, in December of the year before the election, and pay a filing fee or submit a nomination petition. *See* §§ 172.021(a),(b); 172.023(a). The filing fees range from a high of $5,000 to a low of $75, depending on the office. *See* § 172.024. Most candidates simply pay the fee, but if they choose to submit a nomination petition instead, their signature requirements are capped at a fixed number, from a high of 5,000 for statewide office, to a low of 500 or less for district, county or precinct offices. *See* § 172.025. In addition, there is no statutory limitation on how early they may start collecting signatures.

26.     Although Primary Parties are required to hold primary elections, Texas provides them with start-up funds and reimburses their costs.  *See* §§ 173.001-087.  Each Primary Party chair submits an itemized statement of estimated costs, which the Secretary "shall approve" provided that the Secretary determines the costs to be "reasonably necessary for the proper holding of the primary election."  *See* §§ 173.081-82(b).

27.     Since 1972, Texas has spent millions of dollars in public funds to pay for the Primary Parties' primary elections.  The Primary Parties use such funds to pay for precinct workers and other elections officials, equipment, transportation, polling place rentals, office rentals, office personnel, office supplies and postage, among many other expenses.

28.     Texas has also implemented electronic procedures that minimize the burden on Primary Parties.  For example, party chairs are required to submit information to the Secretary about each candidate who applies to appear on the primary election ballot, but Texas enables them to do so electronically.  It also requires the Secretary to maintain an online database of that information, which must be made accessible to the party chairs.  *See* § 172.029(b).  Texas also enables Primary Parties to certify primary election results electronically.  *See* §§ 172.116, 172.117(a), 172.122.

**B.     Texas Allows Non-Primary Parties Ballot Access Only if They Submit Convention Participant Lists or Nomination Petitions Signed by the Required Number of Eligible Voters**

29.     In contrast to the Primary Parties, new political parties and those that did not receive at least 2 percent of the total vote cast for governor in the preceding election – *i.e.*, Non-Primary Parties – must nominate their candidates by convention.  *See* §§ 181.002, 181.003, 172.002.

30.     A political party that intends to nominate by convention must register with the Secretary by January 2 of the election year.  *See* § 181.0041.  Candidates who intend to seek the

party's nomination must file a notarized application with the party's state or county chair, depending on the office, one month earlier, in December of the year before the election. *See* §§ 141.031, 172.023(a), 181.031-33. The nominating conventions are held after the general primary election date, in March of the election year for county, precinct and district offices, and in April of the election year for statewide offices. *See* §§ 41.007(a), 181.061(a),(b),(c).

31.     A Non-Primary Party may not place its nominees on the general election ballot unless, within 75 days of the precinct convention date, it files precinct convention participant lists with the Secretary that contain participants equal in number to at least 1 percent of the total vote for governor in the preceding general election. *See* § 181.005(a). A precinct convention participant must be a registered voter or resident of the precinct who is eligible to vote a limited ballot, and who has not voted in a primary election or attended the convention of another party in the same election year. *See* §§ 162.001, 162.003, 162.012, 162.014, 181.065, 112.002-04. The participant lists must include each participant's residence address and voter registration number. *See* § 181.005(a).

32.     In 2018, the 1 percent requirement imposed by § 181.005(a) translated to 47,183 participants. In 2020, due to the increased voter turnout in the 2018 general election, it translates to 83,717 participants.

33.     The burden of assembling the required number of participants on a single day is so great that no Non-Primary Party has qualified for the ballot pursuant to §181.005(a) in at least 50 years.

34.     When a Non-Primary Party's precinct convention participant lists lack the required number of participants, Texas provides it with only one alternative method to qualify for the ballot: the party is required to file nomination petitions, within the same 75-day period

specified by § 181.005(a), which contain enough valid signatures to make up for the shortfall. *See* §§ 181.006(a),(b).

35.    Texas imposes many additional requirements, restrictions and prohibitions that make complying with the requirements imposed by §§ 181.005 and 181.006 more burdensome. Among the most significant are the provisions that prohibit voters from signing nomination petitions until after the primary election, and that render voters ineligible to participate in precinct conventions or sign nomination petitions if they vote in a primary election. *See* §§ 162.001, 162.003, 162.012, 162.014; 181.006(g),(j).  These provisions place Non-Primary Parties at a significant disadvantage, by giving Primary Parties a first, exclusive right to solicit voters' support, at a time when Non-Primary Parties are prohibited by law from formally affiliating with them via convention or by obtaining their signatures on a nomination petition.

36.    Voters are also prohibited from signing nomination petitions if they participate in another political party's convention in the same year the petition is circulated, or if they previously signed another political party's nomination petition in the same election. *See* §§ 181.006(g)-(h).  As a result, by signing a nomination petition, voters forfeit their right to affiliate with another political party in the same year.  *See* § 181.006(i).  Additionally, voters must include their address, date of birth or voter registration number and, if the relevant jurisdiction includes more than one county, the county of registration, as well as the date of signing and their printed name.  *See* § 141.063(a)(2).  The part of the petition where the signature appears also must contain the circulator's affidavit required by § 141.065, and at the time of signing, the required oath must appear at the top of the page on which the signature is entered. *See* §§ 141.063(a), 181.006(f).

37.     That oath, which petition circulators must point out and read aloud to each potential signer, states as follows:

> I know that the purpose of this petition is to entitle the _____ Party to have its nominees placed on the ballot in the general election for state and county officers. I have not voted in a primary election or participated in a convention of another party during this voting year, and I understand that I become ineligible to do so by signing this petition.  I understand that signing more than one petition to entitle a party to have its nominees placed on the general election ballot in the same election is prohibited.

*See* §§ 181.006(f); 141.064.  Petition circulators also must witness each signature, confirm that the date of signing is correct, verify each signer's registration status and confirm that each registration number entered on the petition is correct before filing the petition.  *See* § 141.064.  In addition, petition circulators must execute an affidavit stating that they complied with the requirements set forth in § 41.064 and believe each signature to be genuine and the corresponding information correct.  *See* § 141.065.  The violation of any of the foregoing provisions may invalidate an entire nomination petition or the individual signatures on it. *See* §§ 141.062-063.

38.     Once a Non-Primary Party submits its nomination petitions, the Secretary is not required to certify its nominees for placement on the ballot for approximately two months – or 68 days before the general election.  *See* §§ 142.010(b), 181.007(b), 192.033(b).

39.     A Non-Primary Party that succeeds in qualifying for the ballot is entitled to place its nominees on the ballot for one election cycle only, and does not retain ballot access unless at least one of its candidates for statewide office receives at least 5 percent of the vote. *See* § 181.005(b).  In 2019, Texas amended § 181.005 by adding a provision that appears to supersede § 181.005(b), and permits a Non-Primary Party to qualify for the ballot if any of its candidates for statewide office received at least 2 percent of the vote in at least one of the five previous general elections.  *See* § 181.005(c).  A Non-Primary Party that does not qualify to

retain ballot access under § 181.005 must repeat the entire process to qualify again in the next election cycle.

40.     Texas further amended its statutory scheme in 2019 to impose an additional requirement on candidates nominated by a ballot-qualified Non-Primary Party.  Specifically, to appear on the general election ballot, such candidates must either pay a filing fee or submit a nomination petition that complies with § 141.062 and is signed by a specified number of eligible voters.  *See* § 141.041(a).  The filing fees and signature requirements imposed by § 141.041(a) are the same as the filing fees and signature requirements imposed on candidates seeking to appear on a primary election ballot for the same office.  *See* §§ 141.041(b),(e); 172.024-25.

41.     Section 141.041 does not specify the following: (1) when signatures may be collected; (2) which voters are eligible to sign; or (3) when the filing fees must be paid or the nomination petitions submitted.  Instead, § 141.041 provides that the Secretary shall adopt rules as necessary to implement the provision.  *See* § 141.041(f).

42.     The filing fees required by § 141.041 are deposited in the state treasury for the general revenue fund, or the county treasury for the county general fund, depending on the office.  *See* § 141.041(c),(d).  The Texas Legislative Budget Board projects that § 141.041 will have "a positive impact of $230,000 to general revenue related funds through fiscal 2020-21." *See* Texas House Research Organization, *HB 2504 Bill Analysis*, available at https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=86R&Bill=HB2504# (last visited July 11, 2019).

43.     The filing fee and nomination petition requirements imposed by § 141.041 significantly increase the burden that Texas's statutory scheme imposes on Non-Primary Parties, their candidates and supporters, and they are not sufficiently tailored to further any legitimate or compelling state interest.

**C.     Texas Allows Independents Ballot Access Only if They Submit Nomination Petitions Signed by the Required Number of Eligible Voters**

44.     The procedure for Independents to qualify for the ballot is similar to that for Non-Primary Parties, except that Independents may not nominate by convention and must submit nomination petitions signed by eligible voters.

45.     Independents seeking state office must file a declaration of intent in December of the year before the election.  *See* § 142.002.  They also must file an application and a nomination petition that contains valid signatures equal in number to 1 percent of the total vote for governor in the preceding election.  *See* §§ 142.004, 142.007.  That requirement translated to 47,183 valid signatures in 2018, and in 2020, due to increased voter turnout in 2018, it translates to 83,717 valid signatures.

46.     Independents seeking state office must submit their nomination petitions by the 30th day after the runoff primary election day (or after a vacancy in office occurs), but they may not circulate them until after the primary election, or run-off primary election, if there is one. *See* §§ 142.004-06, 142.009, 202.007.  Thus, in 2020, Independents seeking state office have either 30 days or 114 days to collect signatures, depending on the outcome of races over which they have no control.  This uncertainty alone imposes a significant burden that chills potential candidacies.  Further, like Non-Primary Parties, Independents are burdened by the prohibition against obtaining signatures until after the primary election, or runoff primary where applicable, which disadvantages them by giving Primary Parties a first, exclusive right to solicit voters' support at a time when Independents are prohibited by law from formally affiliating with them. *See* § 142.009.

47.     Independents' nomination petitions, and the individual signatures on them, are subject to the same requirements and restrictions that apply for Non-Primary Parties, and may be invalidated on those grounds.  *See* §§ 141.062-66.  Further, voters may not sign the petition of

more than one candidate for the same office in the same election, and if they do, the subsequent signature is invalid.  *See* § 141.066(a),(c).

48.     Additionally, each page of a petition for an Independent seeking state office must include the following oath at the top, which circulators must point out and read aloud to each potential signer:

> I know the purpose of this petition.  I have not voted in the general primary election or runoff primary election of any political party that has nominated, at either election, a candidate for the office of (insert office title) for which (insert candidate's name) is a candidate.

*See* §§ 141.064, 142.008.

49.     Independent candidates for president also must file an application and nomination petition, which must comply with §§ 141.031(a)(4) and 141.062, respectively, but their signature requirement is equal to at least 1 percent of the total vote for president (in Texas) in the preceding presidential election.  *See* §§ 192.032 (a),(b),(d).  In 2016, this requirement translated to 79,939 valid signatures.  In 2020, it translates to 89,692 valid signatures.

50.     An Independent candidate for president's application must be filed with the Secretary no later than the second Monday in May of the presidential year – the second-earliest filing deadline in the nation – and the petition may not be circulated until after the presidential primary, which will be held in 2020 on March 3.  *See* §§ 192.032(c),(g), 41.007(c).  Thus, in 2020, an Independent candidate for president will have only 69 days to collect signatures.

51.     Each page of an Independent candidate for president's petition must include the following oath at the top, which the petition circulator must point to and recite aloud to each signer: "I did not vote this year in a presidential primary election."  *See* §§ 141.064(1), 192.032(f).  A signature on the petition is invalid if the signer signs on or before the presidential primary election or voted in that election.  *See* § 192.032(g).  Thus, Independent candidates for president are also burdened by the prohibition against formally affiliating with voters, by

obtaining their signatures on nomination petitions, until after the Primary Parties exercise their first, exclusive right to seek voters' support.

52. Texas makes no provision for Independents to retain ballot access.

## III. Independents and Non-Primary Parties Must Follow Separate Procedures that Require Them to Expend a Massive Amount of Funds and Resources

53. In the 114 years since Texas began regulating ballot access, the burden and expense that its statutory scheme imposes on Independents and Non-Primary Parties has increased exponentially. That is because they must collect an ever-increasing number of signatures in the same fixed period of time, and also because Texas's nomination petition procedure itself is obsolete and inadequate to the task. Collecting signatures by hand is inherently time-consuming, labor-intensive and expensive, and at each step in the process, the inefficiency of the procedure compounds the severity of the burden of complying with it. The large number of signatures that Texas now requires statewide Independents and Non-Primary Parties to collect in a fixed and limited period of time therefore requires a massive expenditure of funds and resources.

54. In Texas, a trained petition circulator working diligently under optimal conditions can collect 10 signatures per hour, on average, with a validity rate of approximately 70 percent. This translates to a total of 400 raw signatures, or 280 valid signatures, in a full-time, 40-hour work week. Based on those figures, to obtain the required number of valid signatures within the time permitted in 2020, an Independent running for state office must enlist approximately 19 full-time, trained petition circulators if there is no runoff primary, and approximately 70 full-time, trained petition circulators if there is a runoff primary. An Independent running for president will need approximately 33 full-time, trained petition circulators. To comply with its

requirements in 2020, a Non-Primary Party will need to enlist approximately 28 full-time, trained petition circulators.

55.     Volunteer petition circulators are usually unable to work full-time for the entire duration of a petitioning period.   Instead, the most dedicated volunteers typically average between 10 and 20 hours per week, while the majority work fewer hours than that.   An all-volunteer petition drive thus will require at least three or four times the number of full-time petition circulators calculated in the foregoing paragraph, to compensate for the volunteers' part-time availability.   As a result, to complete a successful petition drive under Texas's statutory scheme as currently applied, statewide Independents and Non-Primary Parties must, as a practical matter, hire paid petition circulators.

56.     Paid petition circulators typically charge a per-signature fee for their services. The market rate in Texas in 2018 was approximately $7.50 per signature, and $10.00 or more if the petitioning period was shortened due to a runoff primary election.   Based on those rates, a successful petition drive in 2020 will cost a Non-Primary Party more than $600,000, not including the necessary cost of collecting more signatures than the requirement, to compensate for those that may be invalidated.   The cost for an Independent seeking state office will also be more than $600,000, if there is no runoff primary, and even more if there is a runoff primary – again excluding the additional necessary cost of collecting more signatures than the requirement. For a presidential Independent, the cost will be more than $650,000, plus the additional necessary cost of collecting more signatures than the requirement.

57.     The high cost of completing a nomination petition drive is a direct function of the ever-increasing number of signatures that Independents and Non-Primary Parties must obtain in the same fixed period of time.   At each step in the process, moreover, from collecting signatures, to reviewing and validating them, to submitting them to the Secretary before the filing deadline,

the inefficiency of the nomination petition procedure compounds the burden and increases the cost of complying with it.

58.     Because signatures generally must be gathered outside, in public spaces, inclement weather can make doing so all but impossible on any given day, effectively shortening the petitioning period.  The availability of suitable locations where there is sufficient foot traffic is also limited, because not every public sidewalk is a traditional public forum where protection for the right to petition is at its zenith, and petitioning on private property such as shopping centers is subject to less protection, if any.   Further, local officials and property owners are frequently unaware of petition circulators' First Amendment rights.   Consequently, petition circulators are often forced to relocate, losing valuable time in the process, even when they are engaged in First Amendment protected conduct.   All of these factors can lower petition circulators' productivity from the collection rate they achieve under optimal conditions.

59.     Voters who support the right of an Independent or Non-Primary Party to participate in an election are often unwilling to stop in public and provide their signatures and personal information to an unknown petition circulator.   Other potential signers may be confrontational, threatening or abusive. Additionally, political adversaries or unscrupulous petition circulators can sabotage paper nomination petitions by deliberately signing ineligible or fraudulent names.

60.     The challenges that petition circulators face are exacerbated by the fact that they have no practicable method of confirming, in real time, that potential signers are eligible – that they live in the correct jurisdiction, and that they have not voted in a primary election or signed the nomination petition of another candidate or party.   Petition circulators must nevertheless make a reasonable effort to confirm a signer's eligibility, and later attest to it, which increases the time needed to obtain each signature.   The oath that petition circulators must recite to potential

signers adds further delay, and often intimidates or otherwise dissuades voters from signing.  *See*

§§ 141.064(1), 142.008, 181.006(f), 192.032(f).

61.     Once signatures are collected, the requirement that petition circulators review

them and execute a notarized affidavit attesting that they verified each signer's registration status

and believe the signatures to be genuine and the related information correct adds yet another

burdensome and time-consuming step to the process.  *See* §§ 141.064-65.  Confirming this

information is even more laborious because it is generally gathered on busy sidewalks or public

spaces, using a clipboard or another makeshift writing surface, making the hand-writing more

difficult to discern.  As a result, many signatures are impossible to verify, making it necessary to

collect even more signatures to compensate for those that are illegible.

62.     At the completion of their petition drive, Independents and Non-Primary Parties

must obtain their petitions from circulators throughout the state and then review them for

compliance to ensure they have enough signatures.  Because the nomination petition form

prescribed by the Secretary allows room for only 10 signatures per page, this involves organizing

thousands of petition pages in multiple boxes.  Finally, the petitions must be delivered by truck

or van to the Secretary's office in Austin.

63.     To comply with the additional filing fee or nomination petition requirement that

§ 141.041(a) imposes, Non-Primary Party candidates must expend substantially more funds or

resources.

## IV.     Texas's Statutory Scheme Imposes a *De Facto* Financial Barrier Against Independents and Non-Primary Parties Who Seek to Appear on the General Election Ballot

64.     The cost of complying with the ballot access procedures that Independents and

Non-Primary Parties must follow functions as a *de facto* financial barrier to their participation in

Texas's elections.

65.     Since 1972, with few exceptions if any, no statewide Independent or Non-Primary Party has qualified for the Texas ballot except by spending substantial funds to complete a petition drive.

66.     Any statewide Independent or Non-Primary Party that completed a successful petition drive since 1972, without spending substantial funds, did so only through a massive mobilization of resources, including but not limited to volunteer labor and food, lodging and travel expenses, all of which have substantial value.  Additionally, dedication of such resources to a petition drive directly detracts from the resources that Independents or Non-Primary Parties can dedicate to their election campaigns, as opposed to their efforts to gain ballot access.

## V.     Texas's Statutory Scheme Severely and Unequally Burdens the Constitutional Rights of Independents, Non-Primary Parties and Voters Who Want the Opportunity to Vote for Them, Including Plaintiffs

67.     The financial barrier to entry that Texas's statutory scheme now imposes upon statewide Independents and Non-Primary Parties, including certain Plaintiffs, is near-absolute. Such Plaintiffs neither possess the funds needed to comply with Texas's statutory scheme as currently applied, nor do they have the ability to raise such exorbitant sums.  To qualify for the ballot in 2020, therefore, they have no choice but to rely on volunteer petition circulators to collect the 80,000-plus valid signatures required in the limited time permitted.  In the last 50 years, however, when substantially fewer signatures were required, any successful volunteer effort to qualify statewide Independents or Non-Primary Parties for the ballot was already an exceedingly rare, isolated incident, which still required a massive mobilization of resources to complete.  In 2020, when the signature requirements are five or six times greater than the number needed in 1968, obtaining the required number of signatures in the fixed period of time allowed will be all but impossible without spending hundreds of thousands of dollars, and even then ballot access is not assured.

20

68.     The additional filing fee or nomination petition requirement imposed by § 141.041, which will first take effect in 2020, substantially increases the burden that Texas's statutory scheme now imposes on Non-Primary Parties, their candidates and supporters.

69.     By imposing a near-absolute barrier to their participation in its electoral process, Texas's statutory scheme severely burdens Plaintiffs' First and Fourteenth Amendment rights to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law.  Plaintiffs' exclusion from the electoral process harms their ability to engage in political speech for purposes of influencing the public debate and prevents them from representing the interests of their voter-supporters within the electoral arena, as well as the interests of all voters who desire more meaningful choices on the general election ballot.  It also denies them one of the most valuable opportunities of building voter support for their political platforms – by running candidates for public office – and dissuades voters from supporting them. Plaintiffs' exclusion further harms their ability to raise and spend funds to promote their political goals.

70.     Texas's statutory scheme specifically injures the Non-Primary Party Plaintiffs by restricting their ability to grow and develop as parties.  Due to their exclusion from the electoral process, voters who support their platforms, including their own members, often vote for candidates from other parties.  Some Non-Primary Party members defect to a ballot-qualified Primary Party, despite their continued support for the Non-Primary Party's platform.  The Non-Primary Parties' ability to recruit candidates is also harmed, because even their most ardent and loyal members are often unwilling to accept their nomination, when they know they will not appear on the ballot.

71.     Further, because attempting to qualify for the ballot is an all-consuming and exhaustive process, Non-Primary Parties that have succeeded must prioritize ballot retention

above all other goals.  This imperative distorts their electoral strategy because it compels them to divert their limited resources from the higher-profile races for Governor, Attorney General and U.S. Senate, in which they could spread their message and build voter support most effectively, and to dedicate them instead to races for lower-profile statewide offices, in which their chances of reaching the threshold for retaining ballot access are greater.  With rare exceptions, Non-Primary Parties have retained ballot access only by running candidates in such races, which one Primary Party or the other declines to contest.  The Primary Parties therefore exercise considerable control over a Non-Primary Party's ability to retain ballot access.

72.     Texas's statutory scheme specifically injures Independents by requiring them to submit a Declaration of Intent in December of the year before an election, long before the Primary Party nominees are known, and before the campaign platforms and issues have crystallized, effectively preventing them from responding to the most important factors that motivate Independents to run and motivate voters to support them.  In addition, because Independents cannot circulate their nomination petitions until after the primary election, or the runoff primary if there is one, it is impossible for them to know when the petitioning period will begin until it actually starts.  This uncertainty makes it especially difficult for Independents to ensure their petition circulators are ready to begin on the first day of the petitioning period. Independents who run in a race with a runoff primary face the additional burden of a petitioning period shortened to only 30 days, whereas those running in races without a runoff primary have as much as three times as long to obtain the same number of signatures, because the filing deadline for all Independents is 30 days after the runoff primary.  Independent candidates for president face yet another unequal burden, imposed by a signature requirement that is substantially higher than the one that applies to Independents seeking state office and Non-Primary Parties.

73.     Both Independents and Non-Primary Parties are additionally burdened by the combined effect of the prohibition against obtaining signatures until after the primary election, and the prohibition against primary election voters signing nomination petitions (or participating in a Non-Primary Party's precinct conventions).  The unequal impact of these prohibitions is to give Primary Parties an exclusive statutory right to affiliate with voters, before Independents and Non-Primary Parties are permitted to do so.  Only after Primary Parties have exercised this right are Independents and Non-Primary Parties permitted by law to affiliate with the remaining voters by obtaining their signatures on nomination petitions.

74.     The very existence of Texas's statutory scheme chills and suppresses Plaintiffs' exercise of their First Amendment rights, by compelling them either to forgo participation in Texas's electoral process altogether, or to pursue other, less effective means of furthering their political objectives.  Rather than waste their limited resources on a futile effort to qualify for the ballot, for instance, Non-Primary Party Plaintiffs have run their nominees as Independents in down-ballot races, which have much lower signature requirements, thereby enabling them to qualify for the ballot without the massive expenditure of funds and resources necessary to complete statewide petition drives.  Non-Primary Party Plaintiffs have also endorsed candidates of other ballot-qualified parties in an effort to exert influence over the political process despite their exclusion from the ballot.  Texas's statutory scheme thus imposes severe burdens on these Plaintiffs' speech and associational rights, by leaving them no option but to abandon their preferred partisan affiliation as a condition of their participation in the electoral process.

75.     Although statewide Independents and Non-Primary Parties have overcome the financial barrier and other obstacles that Texas's statutory scheme imposed in prior elections, when signature requirements were significantly lower than the 2020 requirements, they have done so only rarely, by severely depleting or exhausting their funds and resources and, in some

cases, incurring substantial debt. Consequently, these candidacies and parties start the general election cycle in a weakened state, with few or no resources to support their campaigns. They are further disadvantaged by the approximately two-month wait until the Secretary certifies them for the ballot, which prevents them from campaigning, fundraising and competing as ballot-qualified contenders during that critical time. In effect, Texas's statutory scheme shortens the general election for Independents and Non-Primary Parties to just 68 days. This additional burden is wholly unnecessary, because the Secretary is authorized to presume the validity of signatures submitted with the proper affidavit, and also to validate signatures by statistical sample. *See* §§ 141.065(b), 141.069.

76. In addition, because Texas does not allow Independents and Non-Primary Parties to certify their candidates for the ballot electronically, the Secretary does not include their nominees for county and precinct races in the official list of candidates on the Secretary's website. *See* November 6, 2018 General Election Ballot, available at https://webservices.sos.state.tx.us/ballot-cert/report.aspx (last visited July 11, 2019). Instead, the Secretary's website refers visitors to individual county election offices "to determine if there are" Independent or Non-Primary Party candidates in county or precinct races. *See id.* Such omission further disadvantages Independent and Non-Primary Party candidates for county and precinct offices by placing them on a separate and unequal footing with respect to Primary Party candidates for those offices, who are included in the official list on the Secretary's website.

77. Taken together, the combined impact of the severe and unequal burdens that Texas's statutory scheme imposes on Independents and Non-Primary Parties, including Plaintiffs, traps them in a vicious cycle. It requires them to demonstrate voter support to qualify for ballot access, but makes the procedure for doing so prohibitively expensive. As a result, it compels them to exhaust their resources and focus their strategy on a never-ending effort to

obtain or retain ballot access, at the expense of campaigning for elective office and other activity that would enable them to build the voter support that Texas requires.  Further, while a ballot-qualified Non-Primary Party must prioritize ballot retention above all else, to the detriment of its political priorities, Independents are never more than a single election away from the need to qualify all over again, because Texas does not allow them to retain ballot access.  This cycle eviscerates the ability of Independents and Non-Primary Parties to function effectively – if at all – within Texas's electoral arena.

78.     Ultimately, Texas voters, including the voter-Plaintiffs, bear the brunt of its exclusionary ballot access scheme.  Plaintiffs' preferred candidates are either excluded from the ballot or significantly disadvantaged by the severe burdens it imposes.  This infringes Plaintiffs' right to cast their vote effectively, not only because it prevents them from voting for their preferred candidates, but also because the exclusion of such candidates stifles public debate during elections and limits the robust electoral competition that enables voters to express their preferences and hold elected officials accountable when they are not responsive.  Texas's statutory scheme harms voters by unconstitutionally restricting their ability to make meaningful choices that reflect their preferences when they cast their votes.

## VI.    Texas's Nomination Petition Procedure Is Not Sufficiently Tailored to Serve Its Legitimate Regulatory Interests, and Less Burdensome Alternatives Are Available

79.     Texas's nomination petition procedure is not sufficiently tailored to serve its interest in limiting ballot access to candidates who have demonstrated a modicum of public support.  The procedure necessarily excludes those who lack sufficient resources to conduct a successful petition drive, even if they have substantial public support, while providing wealthy candidates and parties a means of gaining ballot access even if they lack the requisite support.  Further, the additional filing fee or nomination petition requirement that Texas now imposes

upon Non-Primary Party candidates pursuant to § 141.041 is not justified by any legitimate or compelling state interest.

80.     Texas could substantially reduce or eliminate the severe and unequal burdens its statutory scheme imposes on Independents and Non-Primary Parties – and specifically the financial burden of complying with its signature requirements – if it adopted more efficient electronic procedures for them to follow.  In Arizona, for instance, the state has implemented a secure online platform that enables voters to sign nomination petitions online, and also confirms their eligibility and validates their signatures automatically.  *See* Arizona Secretary of State Citizens Clean Elections Commission, *E-QUAL*, http://apps.azsos.gov/equal/ (last visited July 11, 2019).  Implementation of such a platform in Texas would enable Independents and Non-Primary Parties to demonstrate the requisite public support without obliging them to meet tens of thousands of voters in person, in a limited period of time, to obtain their signatures.  It would also enable petition circulators to validate signatures automatically, further reducing the burden imposed by Texas's nomination petition procedure.

81.     The District of Columbia and Denver, Colorado have implemented a similar procedure, called eSign, which enables voters to sign nomination petitions electronically and automatically validates their signatures, by using tablets that are integrated with the city's voter rolls.  Illinois and West Virginia have also adopted web-based procedures to regulate their electoral processes.

82.     Texas could further reduce the burden and expense that its statutory scheme imposes on Independents and Non-Primary Parties, while protecting its legitimate interests, by amending or eliminating many of its provisions.  For example, it could eliminate the prohibition against signing nomination petitions before the primary election, thus allowing Independents and Non-Primary Parties to compete for voters' support on an equal footing with Primary Parties.

Texas could also allow more time for collecting signatures, by eliminating the starting time, as it has done for candidates seeking access to primary election ballots, and by making its filing deadlines later.   In addition, Texas could amend the early filing deadlines for declarations of intent, applications for nomination, and registration of new political parties, and it could allow Non-Primary Parties more than one election cycle to achieve the vote threshold for retaining ballot access, all without harming its legitimate regulatory interests.

## VII.   Texas's Statutory Scheme Is Unconstitutional Under Existing Supreme Court Precedent

83.   Texas's statutory scheme operates as an exclusionary mechanism that denies voters, including the voter-Plaintiffs, the right to cast their votes for Independent and Non-Primary Party candidates of their choosing.   *See American Party of Texas v. White*, 415 U.S. 767, 794 (1974).   Further, it imposes financial burdens on Independents and Non-Primary Parties that are so great as to be patently exclusionary in character, and therefore discriminates on the basis of wealth.   *See Bullock*, 405 U.S. at 143.   It severely burdens Plaintiffs' right to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law, and it is not reasonably tailored to further a sufficiently weighty state interest, given the availability of less burdensome alternatives.   *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).   As applied to Plaintiffs, Texas's statutory scheme is unconstitutional.

## CAUSES OF ACTION

## COUNT I

## (Violation of Plaintiffs' Rights Guaranteed by the First and Fourteenth Amendments)

84.   Plaintiffs reassert each preceding allegation as if set forth fully herein.

85.    Texas imposes a broad array of severely burdensome requirements and restrictions on Non-Primary Parties that seek access to its general election ballot. Specifically, such parties must:

    (a)    Ensure that their potential nominees submit candidate applications in December of the year before an election (§§ 181.031, 181.032, 181.033);

    (b)    Register with the Secretary no later than January 2 of the election year (§ 181.0041);

    (c)    Submit lists, within 75 days of their precinct conventions, showing that the number of participants equaled at least one percent of the entire vote for governor in the last general election (§ 181.005(a)), and, if such lists lack the required number of participants, submit nomination petitions containing enough valid signatures to make up for the deficiency, together with notarized affidavits from each petition circulator (§§ 181.006(a),(b); 141.063; 141.065);

    (d)    Point to and recite an oath that applies to each potential signer before obtaining his or her signature (§§ 181.006(f), 141.064);

    (e)    Recruit precinct convention participants or obtain signatures only from registered voters, after the date of the primary election, who did not vote in a primary election or previously sign a petition to place another party's nominees on the ballot for the same election, and who thereby forfeit their right to affiliate with another party during the year in which the petition is signed (§§ 141.063; 162.001, 162.003, 162.012, 162.014;  181.006(g)-(j));

    (f)    Wait until as few as 68 days before the general election for the Secretary to certify their nomination petitions (§ 181.007(b));

    (g)    Submit additional nomination petitions or filing fees for each of their candidates (§ 141.041); and

    (h)    Repeat the process of qualifying for the ballot in the next election cycle, unless one of its nominees for statewide office receives the vote threshold necessary for retaining ballot access (§ 181.005(b),(c)).

86.    Texas imposes a broad array of severely burdensome requirements and restrictions on Independent candidates that seek access to its general election ballot.

87.    Specifically, Independent candidates for statewide office must:

    (a)    File a Declaration of Intent in December of the year before the election (§ 142.002);

(b)    Submit nomination petitions within 30 days of the runoff primary election (§ 142.006) or the date on which a vacancy in office occurs (§ 202.007) that contain valid signatures equal in number to 1 percent of the total vote for governor in the last general election, together with notarized affidavits from each petition circulator (§§ 142.007; 141.063; 141.065);

(c)    Circulate nomination petitions that include an oath confirming the signer has not voted in a primary election for a party that has nominated a candidate for the office the Independent candidate is seeking (§ 142.008);

(d)    Point to and recite the required oath to each potential signer before obtaining his or her signature (§§ 141.064; 142.008);

(e)    Start circulating nomination petitions no sooner than the day after the primary election (§ 142.009); and

(f)    Wait until as few as 68 days before the general election for the Secretary to certify their nomination petitions (§ 142.010(b)).

88.    Independent candidates for president and vice-president must:

(a)    Submit nomination petitions by the second Monday in May that contain valid signatures equal in number to 1 percent of the total vote for president in Texas in the last presidential general election, together with notarized affidavits from each petition circulator (§§ 192.032(a),(b),(c),(d); 141.065);

(b)    Circulate nomination petitions that include an oath confirming the signer has not voted in a presidential primary that year (§ 192.032(f));

(c)    Point to and recite the required oath to each potential signer before obtaining his or her signature (§§ 192.032(f), 141.064); and

(d)    Start circulating nomination petitions no sooner than the day after the presidential primary election, and any signature collected before that date, or from a signer who voted in a presidential primary that year is invalid (§ 192.032(g)).

89.    The statutory provisions in the preceding two paragraphs, operating in conjunction with one another, impose substantial or severe burdens on Non-Primary Parties and Independent candidates, and on voters who support or may wish to support them, which are not justified by any legitimate or compelling state interest.

90.     These provisions, as applied in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT II

**(Violation of Plaintiffs' Rights Guaranteed by the Equal Protection Clause)**

91.     Plaintiffs reassert each preceding allegation as if set forth fully herein.

92.     Texas's ballot access requirements for Independents and Non-Primary Parties, and specifically those statutory provisions enumerated in Count I of this Complaint, as applied in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the Equal Protection Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

93.     WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Enter a declaratory judgment holding that Texas's statutory scheme regulating ballot access for parties that do not nominate by primary election is unconstitutional as applied to Plaintiffs, and that the following statutory provisions are unconstitutional as applied in conjunction with one another: §§ 141.063; 141.041; 141.064; 141.065; 141.066(a),(c); 162.001, 162.003, 162.012, 162.014; 181.0041; 181.005(a),(b),(c); 181.006(a),(b),(f)-(j); 181.007(b); 181.031; 181.032; 181.033;

B.     Enter a declaratory judgment holding that Texas's statutory scheme regulating ballot access for Independent candidates is unconstitutional as applied to Plaintiffs, and that the following statutory provisions are unconstitutional as applied in conjunction with one another: §§ 141.063; 141.064; 141.065; 142.002; 142.006; 142.007; 142.008; 142.009; 142.010(b); 192.032(a)-(d),(f),(g); 202.007;

C.     Enter an order enjoining the Secretary of State from enforcing the challenged provisions as applied to Plaintiffs;

D.     Award other and further relief as the Court deems proper;

E.     Award litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

F.     Retain jurisdiction of this action and grant the Plaintiffs any further relief
which may in the discretion of the Court be necessary and proper.


Dated: July 11, 2019                                Respectfully submitted,


Oliver Hall                                         David P. Whittlesey
*Pro hac vice* (motion to be filed)                 State Bar No. 00791920
Center for Competitive Democracy                    Jacob Fields *Pro hac vice* (motion to be filed)
P.O. Box 21090                                      **SHEARMAN & STERLING LLP**
Washington, DC, 20009                               111 Congress Avenue, Suite 1700
Email: oliverhall@competitivedemocracy.org          Austin, TX 78701
Tel: +1 (202) 248-9294                              Email: david.whittlesey@shearman.com
                                                            jacob.fields@shearman.com
                                                    Tel: +1 (512) 647-1900
                                                    Fax: +1 (512) 647-1899

                                                    Christopher Ryan
                                                    Michael P. Mitchell
                                                    Anna Stockamore
                                                    *Pro hac vice* (motions to be filed)
                                                    **SHEARMAN & STERLING LLP**
                                                    401 9th St. N.W., Suite 800
                                                    Washington, D.C. 20004
                                                    Email: cryan@shearman.com
                                                            michael.mitchell@shearman.com
                                                            anna.stockamore@shearman.com
                                                    Tel: +1 (202) 508-8000
                                                    Fax: +1 (202) 508-8001

                                                    ***Attorneys for Plaintiffs***