## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| MARK MILLER, SCOTT COPELAND, LAURA PALMER, TOM KLEVEN, ANDY PRIOR, AMERICA'S PARTY OF TEXAS, CONSTITUTION PARTY OF TEXAS, GREEN PARTY OF TEXAS and LIBERTARIAN PARTY OF TEXAS, <br><br> *Plaintiffs*, <br><br> v. <br><br> RUTH R. HUGHS, in her official capacity as the Secretary of State of the State of Texas, and JOSE A. "JOE" ESPARZA, in his official capacity as the Deputy Secretary of State of the State of Texas, <br><br> *Defendants*. | Civil No. 1:19-cv-00700-RP |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT

David P. Whittlesey (SBN 00791920)
Jacob Fields (Pro hac vice)
SHEARMAN & STERLING LLP
300 West 6th Street, Suite 2250
Austin, TX 78701
Email: david.whittlesey@shearman.com
         jacob.fields@shearman.com
Tel: +1 (512) 647-1900
Fax: +1 (512) 647-1899

Christopher Ryan (Pro hac vice)
Michael P. Mitchell (Pro hac vice)
Anna Stockamore (Pro hac vice)
SHEARMAN & STERLING LLP
401 9th St. N.W., Suite 800
Washington, D.C. 20004
Email: cryan@shearman.com
         michael.mitchell@shearman.com
         anna.stockamore@shearman.com
Tel: +1 (202) 508-8000
Fax: +1 (202) 508-8001

Oliver Hall (Pro hac vice)
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC, 20009
Email: oliverhall@competitivedemocracy.org
Tel: +1 (202) 248-9294

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF CHALLENGED STATUTORY PROVISIONS .................................... ix

TABLE OF CERTAIN DEFINED TERMS ........................................................... xi

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 5

    **A.**    Relevant Factual Background ................................................................. 5

        **1.**    Texas Ballot Access History ........................................................ 5

        **2.**    Brief Overview of the Challenged Provisions ............................. 6

        **3.**    The Challenged Provisions Have Severe Impacts ....................... 7

        **4.**    The Challenged Provisions Burden Plaintiffs ............................. 8

    **B.**    Procedural History .................................................................................. 9

LEGAL STANDARD ................................................................................................... 9

    **A.**    Applicable Summary Judgment Standard ............................................. 9

    **B.**    The Supreme Court's *Anderson-Burdick* Standard for Determining the Constitutionality of Ballot Access Provisions .............................. 10

    **C.**    The 47-Year-Old Decision in *American Party of Texas v. White* Is Not Controlling .......... 11

ARGUMENT ............................................................................................................... 13

    **I.**    The Challenged Provisions Implicate Plaintiffs' Fundamental First and Fourteenth Amendment Rights ........................................................ 13

    **II.**    The Challenged Provisions Impose Severe Burdens on Plaintiffs' Fundamental Rights ......... 14

        **A.**    The Number of Signatures Required by Texas Is Excessive ................ 15

        **B.**    The Costs of Conducting a Successful Petition Drive Functions as a *De Facto* Financial Barrier to Independents' and NPPs' Participation in Texas's Electoral Process ................. 16

        **C.**    The Extreme Time Constraints Imposed by Texas on Collecting Signatures Impose Additional Burdens on Plaintiffs' Fundamental Rights ................ 19

        **D.**    Texas's Unnecessarily Time-Consuming and Inefficient Petitioning Procedures Exacerbate the Burdens on Plaintiffs' Fundamental Rights ................ 20

        **E.**    The Newly-Enacted Filing Fees and Petitioning Requirements That § 141.041 Imposes Compound the Already Severe Burdens on NPPs ................ 23

    **III.**    The Challenged Provisions Impose Unequal Burdens on Plaintiffs ........................................ 24

        **A.**    Texas Guarantees PPs' Nominees Ballot Access at Taxpayer Expense but Requires Independents and NPPs to Bear the Prohibitive Cost of Complying With the Procedures They Must Follow ................ 25

**B.** Texas Permits PPs to Retain the Filing Fees Their Candidates Pay but Remits the Filing Fees That NPP Candidates Pay to the State's General Fund ....................................................... 26

**C.** Texas Prohibits Independents and NPPs From Soliciting Voters' Signatures Until After the Primary Election and Prohibits Primary Election Voters From Signing Petitions ............... 26

**D.** Texas Has Adopted Electronic Procedures for PPs but Has Not Adopted Similar Procedures for Independents and NPPs ........................................................................................................ 27

**E.** The Challenged Provisions Limit Independents' and NPPs' General Election Cycle to as Short as 68 Days ................................................................................................................................. 28

**F.** The Challenged Provisions Impose Additional, Unique, and Unequal Burdens on Independents ........................................................................................................................................ 28

 **1.** Independents cannot know in advance when the petitioning period begins. ..................... 28

 **2.** Independent Presidential candidates in particular face additional severe burdens. .......... 29

**IV.** The Challenged Provisions Are Not Narrowly Tailored to Serve Compelling State Interests. 31

 **A.** The Challenged Provisions Are Not Narrowly Tailored ...................................................... 31

 **B.** Less Burdensome Alternatives Are Available to Protect Texas's Legitimate Regulatory Interests. ................................................................................................................................................ 35

CONCLUSION ............................................................................................................................................ 35

# TABLE OF AUTHORITIES

**CASES**                                                                                        **Page(s)**

*American Party of Texas v. White*,
    415 U.S. 767 (1974) ...................................................................................................... *passim*

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ...................................................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................10, 11, 30, 31

*Belitskus v. Pizzingrilli*,
    343 F.3d 632 (3rd Cir. 2003) ...........................................................................................18

*Bullock v. Carter*,
    405 U.S. 134 (1972) ..............................................................................................1, 18, 23, 34

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ................................................................................................11, 14, 31

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000) ........................................................................................................14

*Clean-Up '84 v. Heinrich*,
    590 F. Supp. 928 ............................................................................................................18

*Constitution Party of Pa. v. Cortes*,
    116 F. Supp. 3d 486 (E.D. Pa. 2015) ...............................................................................18

*Cowen v. Raffensperger*,
    No. 1:17-cv-04660 (N.D. Ga., March 29, 2021), Dkt. 159......................................................19

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ........................................................................................................11

*Dart v. Brown*,
    717 F.2d 1491 (5th Cir. 1983) .........................................................................................14

*Dixon v. Maryland State Bd. of Elections*,
    878 F.2d 776 (4th Cir. 1989) ...........................................................................................18

*Fulani v. Krivanek*,
    973 F.2d 1539 (11th Cir. 1992) .......................................................................................18

*Goldstein v. Sec. of the Commonwealth*,
  142 NE 3d 560 (Mass. 2020) ................................................35

*Graveline v. Benson*,
  430 F. Supp. 3d 297 (E.D. Mich. 2019)........................................18

*Graveline v. Benson*,
  992 F.3d 524 (6th Cir. 2021) ...........................................15, 16

*Graveline v. Johnson*,
  747 F. App'x 408-414 (6th Cir. 2018) ...................................11, 15

*Green Party of Georgia v. Kemp*,
  171 F. Supp. 3d 1340 (N.D. Ga. 2016)................................15, 19, 31

*Green Party of Md. v. Hogan*,
  No. 1:20-cv-1253 (D. Md. June 19, 2020)......................................35

*Harper v. Virginia Bd. of Elections*,
  383 U.S. 663 (1966).........................................................17

*Illinois Bd. of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979).........................................................32

*Jenness v. Fortson*,
  403 U.S. 431 (1971).......................................................2, 24

*Kusper v. Pontikes*,
  414 U.S. 51 (1973)..........................................................14

*Lee v. Keith*,
  463 F.3d 763 (7th Cir. 2006) ...........................................15, 16

*Libertarian Party of Il. v. Pritzker*,
  455 F. Supp. 3d 738 (N.D. Ill. 2020) .......................................35

*Libertarian Party of Ohio v. Blackwell*,
  462 F.3d 579 (6th Cir. 2006) ...............................................15

*Libertarian Party of Texas v. Fainter*,
  741 F.2d 728 (5th Cir. 1984) ...............................................12

*Lubin v. Panish*,
  415 U.S. 709 (1974)................................................... *passim*

*LULAC v. Hughes*,
  978 F.3d 136 (5th Cir. 2020) ...............................................11

*McLaughlin v. North Carolina Board of Elections*,
    850 F. Supp. 373 (M.D. N.C. 1994) ...................................................18

*Miss. River Basin Alliance v. Westphal*,
    230 F.3d 170 (5th Cir. 2000) ...........................................................9

*Nader v. Connor*,
    332 F. Supp. 2d 982 (W.D. Tex. 2004)........................................14, 30, 31

*Norman v. Reed*,
    502 U.S. 279 (1992)........................................................................14

*Pilcher v. Rains*,
    853 F.2d 334 (5th Cir. 1988) ...........................................................13

*Poole v. City of Shreveport*,
    691 F.3d 624 (5th Cir. 2012) ...........................................................10

*Richardson v. Texas Secretary of State*,
    978 F.3d 220 (5th Cir. 2020) ...........................................................11

*Storer v. Brown*,
    415 U.S. 724 (1974)........................................................10, 12, 16

*Texas Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ...........................................................11

*In Re Texas House Republican Caucus PAC, et al, Relators*,
    No. 20-0663 (Sept. 5, 2020)..............................................................23

*Texas Independent Party v. Kirk*,
    84 F.3d 178 (5th Cir. 1996) .......................................................31, 35

*In Re: the Green Party of Texas, et al.*,
    No. 20-0708 (Sept. 15, 2020)............................................................23

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)........................................................................10

*Wesberry v. Sanders*,
    376 U.S. 1 (1964)..........................................................................14

*Williams v. Rhodes*,
    393 U.S. 23 (1968).................................................................. *passim*

**Statutes**

McKool-Stroud Primary Financing Law of 1972 ...........................................13

TEX. ELEC. CODE § 41.007(c) ................................................................................................30

TEX. ELEC. CODE § 141.069 ...........................................................................................28, 33

TEX. ELEC. CODE § 141.041 ...................................................................................3, 9, 23, 34

TEX. ELEC. CODE § 141.041(a)(2) ......................................................................................26

TEX. ELEC. CODE § 141.041(b) ...........................................................................................26

TEX. ELEC. CODE § 141.041(c) ......................................................................................26, 34

TEX. ELEC. CODE § 141.064(1) ................................................................................20, 28, 29

TEX. ELEC. CODE § 141.064-65 ...........................................................................................22

TEX. ELEC. CODE § 141.065(b) .....................................................................................28, 33

TEX. ELEC. CODE § 142.004-006 ..............................................................................2, 19, 30

TEX. ELEC. CODE § 142.006 ................................................................................................29

TEX. ELEC. CODE § 142.007 ................................................................................................29

TEX. ELEC. CODE § 142.007(1) .............................................................................................2

TEX. ELEC. CODE § 142.008 ....................................................................................20, 28, 29

TEX. ELEC. CODE § 142.009 ........................................................................................ *passim*

TEX. ELEC. CODE § 142.009(1) .................................................................................... *passim*

TEX. ELEC. CODE § 142.009(2) .............................................................................4, 20, 21, 26

TEX. ELEC. CODE § 142.010(b) .....................................................................................28, 33

TEX. ELEC. CODE § 142.041 ................................................................................................26

TEX. ELEC. CODE § 172.001, et seq. .....................................................................................6

TEX. ELEC. CODE § 172.021(b) .....................................................................................26, 34

TEX. ELEC. CODE § 172.022(a) ...........................................................................................26

TEX. ELEC. CODE § 172.029(b) .......................................................................................4, 27

TEX. ELEC. CODE § 172.116 ............................................................................................4, 27

TEX. ELEC. CODE § 172.117(a) ...........................................................................................27

TEX. ELEC. CODE § 172.122 ..................................................................................27

TEX. ELEC. CODE § 173.031 .............................................................................26, 34

TEX. ELEC. CODE § 173.032 .............................................................................26, 34

TEX. ELEC. CODE § 181.005(a) ............................................................................19

TEX. ELEC. CODE § 181.005(c) ............................................................................29

TEX. ELEC. CODE § 181.006(a),(b)..........................................................................2

TEX. ELEC. CODE § 181.006(f)....................................................................20, 28, 29

TEX. ELEC. CODE § 181.006(g) ......................................................................4, 21, 26

TEX. ELEC. CODE § 181.006(j) ......................................................................4, 21, 26

TEX. ELEC. CODE § 181.007(b) ............................................................................28

TEX. ELEC. CODE § 181.007(b) ............................................................................33

TEX. ELEC. CODE §§ 181.031-033 ..........................................................................31

TEX. ELEC. CODE §181.063) ........................................................................4, 21, 26

TEX. ELEC. CODE § 192.001 *et. seq.* ......................................................................31

TEX. ELEC. CODE § 192.031(3) ............................................................................31

TEX. ELEC. CODE § 192.032(c),(g)..................................................................2, 20, 30

TEX. ELEC. CODE § 192.032(d) ............................................................................29

TEX. ELEC. CODE § 192.032(f)..............................................................................22

TEX. ELEC. CODE § 192.033(b) ............................................................................28

TEX. ELEC. CODE §§ 192.032(c),(d)........................................................................31

TEX. ELEC. CODE § 202.007 ................................................................................30

TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968) ....................................12, 32

**CONSTITUTIONAL**

U.S. Const. amend. I ................................................................10, 11, 13, 14, 21

U.S. Const. amend. IV ................................................................................. *passim*

**RULES**

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) .................................................................9

Fed. R. Civ. P. 56(a) .................................................................................1, 9

**OTHER**

*Race Summary Report – 2012 General Election* .....................................................30

*Race Summary Report – 2014 General Election* .....................................................30

*Race Summary Report – 2016 Democratic Party Primary Election* ..............................32

*Race Summary Report – 2016 General Election* .....................................................30

*Race Summary Report – 2018 General Election* .....................................................30

Stephen A. Higginson, *A Short History of the Right to Petition Government for
 the Redress of Grievances*, YALE L. J., Vol. 96: 142 (1986) ...................................27

Texas Almanac, *Election of Texas Governors, 1900 – 1948* ......................................19

Texas Almanac, *Election of Texas Governors, 1950 – 1972* ......................................19

**TABLE OF CHALLENGED STATUTORY PROVISIONS**

| Statutory Provision | Applies To | Requirement |
|---|---|---|
| § 141.041 | Non-Primary Parties | Candidates seeking nomination at convention must pay filing fee or submit petition in lieu thereof; filing fees and petition requirements equal to those imposed on candidates seeking access to primary election ballot. |
| § 141.063 | Independents and Non-Primary Parties | Petition signature valid only if signer is registered and includes registration number or birth date; the date of signing; printed name; petition also must include required affidavit and oath. |
| § 141.064 | Independents and Non-Primary Parties | Petitioner must point to and recite required oath to each petition signer; witness each signature; verify signing date; and verify signer's registration status and that registration number is correct. |
| § 141.065 | Independents and Non-Primary Parties | Petitioner's affidavit must be notarized and state that petitioner pointed out and read oath to each signer; witnessed each signature; verified each signer's registration status and believes each signature to be genuine. |
| § 141.066(a),(c) | Independents and Voters | A person may not sign the petition of more than one candidate for the same office in the same election, and if a person does, each subsequent signature after the first is invalid. |
| § 142.002 | Independents | Declaration of Intent due in December of the year before the election. |
| § 142.006 | Independents | Petitions due within 30 days of runoff primary. |
| § 142.007 | Independents | Establishes petition signature requirements: for statewide Independents, one percent of total vote for Governor in previous election. |
| § 142.008 | Independents | Oath must appear on each petition page. |
| § 142.009 | Independents | Signatures on petitions invalid if obtained before primary election, or runoff primary, if there is one, or if signer voted in a primary election or runoff primary for the office the Independent seeks. |
| § 142.010(b) | Independents | Secretary not required to certify petitions until 68 days before general election. |
| § 162.001 | Voters | Must be affiliated with party to participate in convention. |
| §162.003 | Voters | Voters become affiliated with party by voting in primary. |
| § 162.012 | Voters | Affiliated voters ineligible to affiliate with another party in same voting year. |

| §162.014 | Voters | Establishes criminal penalties for unlawful participation in convention or primary. |
|---|---|---|
| § 181.005(a) | Non-Primary Parties | Party must submit lists within 75 days of their precinct conventions showing that the number of participants equaled at least one percent of the entire vote for governor in the last general election. |
| § 181.005(c) | Non-Primary Parties | Party does not qualify to retain ballot access unless one of its candidates for statewide office received at least two percent of the vote at least once in the preceding five elections. **(Plaintiffs do not challenge this requirement, enacted in 2019, which appears to supersede the prior requirement established by § 181.005(b)).** |
| §§ 181.006(a),(b) | Non-Primary Parties | If party fails to comply with § 181.005(a), it must submit petitions containing enough valid signatures to make up for the deficiency (with notarized affidavits from each petition circulator, *see* §§ 141.063, 141.065). |
| § 181.006(f) | Non-Primary Parties | Oath must appear on each petition page. |
| § 181.006(g)-(j) | Non-Primary Parties | Petitions must be signed by registered voters, after the date of the primary election, who did not vote in a primary election or previously sign a petition to place another party's nominees on the ballot for the same election. |
| § 181.007(b) | Non-Primary Parties | Secretary not required to certify petitions until 68 days before general election. |
| §§ 181.031 - 181.033 | Non-Primary Parties | Potential nominees must submit candidate applications in December of the year before an election. |
| § 181.0041 | Non-Primary Parties | Party must register with the Secretary no later than January 2 of the election year. |
| §§192.032(a),(b),(c),(d) | Presidential Independents | Petitions must be submitted by the second Monday in May and contain valid signatures equal in number to 1 percent of the total vote for president in Texas in the last presidential general election. |
| § 192.032(f) | Presidential Independents | Oath must appear on each petition page. |
| § 192.032(g) | Presidential Independents | Petitions must be circulated after the presidential primary election; and any signature collected before that date, or from a signer who voted in a presidential primary that year is invalid. |
| § 202.007 | Independents | If a vacancy occurs after runoff primary election day, an Independent's petitions for that office are due 30 days after vacancy occurs or the 70th day before the general election, whichever is earlier. |

**TABLE OF CERTAIN DEFINED TERMS**

| Term | Definition |
|---|---|
| Independent | A candidate for statewide public office who petitions to appear on the general election ballot without affiliating with a political party.<br>(*See* §§ 142.001-10, 192.032.) |
| Non-Primary Party ("**NPP**") | A political party that does not hold a primary election but nominates candidates for the general election ballot at conventions.<br>(*See* §§ 141.041, 181.001-068.) |
| Primary Party ("**PP**") | A political party that nominates candidates for the general election ballot at primary elections. (*See* §§ 172.001-173.087.) |

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs Mark Miller, Scott Copeland, Laura Palmer, Tom Kleven, Andy Prior, America's Party of Texas ("**APTX**"), Constitution Party of Texas ("**CPTX**"), Green Party of Texas ("**GPTX**"), and Libertarian Party of Texas ("**LPTX**") (collectively, "**Plaintiffs**") respectfully move for summary judgment as to Count I and Count II of the Amended Complaint. The undisputed facts demonstrate that the challenged provisions of the Texas Election Code (the "**Challenged Provisions**") impose severe and unequal burdens on Plaintiffs' First and Fourteenth Amendment rights, and they are not narrowly tailored to further compelling state interests. Plaintiffs are therefore entitled to judgment as a matter of law. In support of this motion, Plaintiffs respectfully submit this memorandum of law, the Statement of Undisputed Material Facts submitted herewith and the 16 declarations[1] and accompanying exhibits thereto, the expert report of Richard Winger, dated January 26, 2021 (the "Winger Report"), and the transcript of the deposition of Keith Ingram, dated July 19, 2021 ("Ingram Dep.").

## INTRODUCTION

The Supreme Court has long held that states may not condition ballot access on candidates' or political parties' financial status. *See Bullock v. Carter*, 405 U.S. 134 (1972); *Lubin v. Panish*, 415 U.S. 709 (1974). The record in this case conclusively establishes, however, that statewide

---

[1] Declaration of Oliver Hall, dated August 31, 2021 ("Hall Decl."); Declaration of Andy Prior, dated August 29, 2021 ("Prior Decl."); Declaration of Wes Benedict, dated August 27, 2021 ("Benedict Decl."); Declaration of Bay Buchanan, dated August 27, 2021 ("Buchanan Decl."); Declaration of Scott Copeland, dated August 27, 2021 ("Copeland Decl."); Declaration of Laura Palmer, dated August 31, 2021 ("Palmer Decl."); Declaration of Danny Harrison, dated August 30, 2021 ("Harrison Decl."); Declaration of Jason Kafoury, dated August 26, 2021("Kafoury Decl."); Declaration of William King, dated August 25, 2021 ("King Decl."); Declaration of Amber McReynolds, dated August 30, 2021 ("McReynolds Decl."); Declaration of Mark Miller, dated August 27, 2021 ("Miller Decl."); Declaration of Trenton Donn Pool, dated August 30, 2021 ("Pool Decl."); Declaration of William Redpath, dated August 26, 2021 ("Redpath Decl."); Declaration of Thomas Kleven, dated August 30, 2021 ("Kleven Decl."); Declaration of Russell J. Verney, dated August 26, 2021 ("Verney Decl."); Declaration of Whitney Bilyeu, dated August 29, 2021 ("Bilyeu Decl.").

Independents and NPPs cannot qualify for the ballot in the State of Texas ("Texas") unless they have substantial funds to hire petition circulators to gather tens of thousands of signatures in a short period of time. The record also establishes that the cost of doing so now approaches $1 million or more. Those astronomical costs are caused by Texas's high signature requirements – the second highest in the nation – in combination with Texas's short petitioning periods, its 116-year old petitioning procedures, and other unique restrictions and requirements. Taken together, these provisions "operate to freeze the political status quo" in Texas: they interpose a near-absolute barrier to Independents and NPPs. *See Jenness v. Fortson*, 403 U.S. 431, 438 (1971).

> ***The Challenged Provisions Are the Most Burdensome and Expensive in the Nation.*** In 2022, a statewide Independent must collect 83,434 valid signatures in just 107 days, while an NPP must collect the same number in just 75 days. *See* Tex. Elec. Code §§ 142.004-06, 142.007(1), 142.009 (establishing Independent requirements); §§ 181.005(a), 181.006(a),(b) (establishing NPP requirements).[2] In 2024, a presidential Independent must collect 113,151 valid signatures in just 68 days. *See* §§ 192.032(c),(g); 41.007(c). No other state requires so many signatures in such a short a time. *See* Hall Decl. ¶ 24. As a result, statewide petition drives cannot succeed in Texas today unless paid petition circulators are hired – indeed, the record demonstrates that volunteer-led petition drives have not succeeded in decades. *See* Hall Decl. ¶¶ 5-17; Palmer Decl. ¶ 6; Buchanan Decl. ¶ 13; Verney Decl. ¶¶ 4,6,14,15,18; Kafoury Decl. ¶ 18; Bilyeu Decl. ¶ 23; Harrison Decl. ¶ 6; King Decl. ¶¶ 8-11.

As Texas's signature requirements have steadily risen over the years (because they are based on a percentage of votes cast in the most recent Gubernatorial or Presidential elections), while its petitioning periods remain fixed, the cost of conducting a statewide petition drive has

---

[2] Hereinafter, all statutory citations are to the Texas Election Code unless otherwise indicated.

skyrocketed. For the last two decades, any successful statewide petition drive has cost well over $100,000, and most cost hundreds of thousands of dollars.  *See* Hall Decl. ¶¶ 5-17; Buchanan Decl. ¶¶ 12-13; Bilyeu Decl. ¶ 23; Benedict Decl. ¶ 19. In 2010, a statewide petition drive cost more than $500,000. *See* Hall Decl. ¶ 17; Palmer Decl. ¶ 10. By 2018, petitioning firms were charging up to $797,000, *see* Harrison Decl. ¶ 6; Prior Decl. ¶ 8, and in 2022, they are charging between $882,000 and $1.375 million. *See* King Decl. ¶¶ 8-11. These costs are not just staggering, they are insurmountable for the non-wealthy, including Plaintiffs. *See* Palmer Decl. ¶ 20; Bilyeu Decl. ¶ 35; Copeland Decl. ¶ 7; Prior Decl. ¶¶ 7-9, 12.[3]

Texas has not updated or improved its petitioning procedures in the 116 years since it first adopted them in 1905. *See* Ingram Dep. 62:23 – 64:4, 216:21 – 217:11. The uncontested evidence demonstrates that collecting signatures by hand on paper petitions is inherently laborious, time-consuming, inefficient and expensive. *See* Benedict Decl. ¶¶ 20-25; Buchanan Decl. ¶¶ 15-16; Verney Decl. ¶¶ 11-12, 16-17; Kafoury Decl. ¶¶ 12-15. Thus, while Texas's petitioning procedures may have been adequate in 1906, when Texas only required 2,802 signatures for statewide ballot access, they are grossly inadequate to the task today, when Texas's signature requirements have increased exponentially.

Texas also imposes additional requirements and restrictions that make petitioning more difficult there than any other state.  Chief among them are its "primary screenout" provisions, which prohibit Independents and NPPs from collecting signatures until after the primary elections

---

[3] In 2019, Texas made things even worse for NPPs by enacting § 141.041, which requires any candidate who seeks their nomination to comply with the same filing fee or petition requirements that apply to candidates seeking to appear on the primary election ballot. *See* §§ 141.041; 172.024, 172.025. The undisputed evidence demonstrates that § 141.041 is unnecessary to serve any legitimate state interest and ensures that Texas *profits*, financially, from NPPs' participation in its elections. *See* Ingram Dep. 50:14 – 51:5; – 51:10; 49:20 – 49:22.

and prohibit voters who voted in a primary from signing their petitions. *See* §§ 181.006(j), 181.063, 142.009(1); §§ 181.006(g), 142.009(2).  This makes petitioning in Texas more time-consuming and expensive than in other states, because it reduces the number of eligible signers, increases the number of invalid signatures that petitioners collect, and makes petitioning on primary election day – which is by far the most productive day of a petition drive – impossible.  *See* Pool Decl. ¶ 18; Redpath Decl. ¶¶ 6, 9, 10, 13, 22; Benedict Decl. ¶¶ 6, 22; Buchanan Decl. ¶ 15; Kafoury Decl. ¶ 14.  Texas also, unlike any other state, requires that petition circulators recite a lengthy and legalistic oath to each potential petition signer, to confirm that they have not voted in a primary, which dissuades many people from signing the petition. *See* Redpath Decl. ¶ 25; Benedict Decl. ¶ 23; Pool Decl. ¶ 19; Kafoury Decl. ¶ 13.

   ***Texas Guarantees PPs Ballot Access at Taxpayer Expense.***  PPs face no such burdens, financial or otherwise. PPs are entitled to place their nominees on the general election ballot automatically once they are selected in taxpayer-funded primary elections. *See* §§ 172.116; 172.117(a); 172.120(a),(h); 172.122; 173.001 *et seq.* In each election cycle since 1972, Texas has spent millions of dollars in taxpayer funds to pay for the PPs' primaries, and in 2020 alone it paid approximately $18 million. *See* Ingram Dep. 28:4 – 29:3; 136:1 – 136:21. Texas has also adopted modern, electronic procedures to facilitate the PPs' administration of their primary elections. *See* §§ 172.029(b); 172.116, 172.117(a), 172.122.  Yet Texas has made no attempt to explore alternatives that could ease the heavy burdens the Challenged Provisions impose on Independents and NPPs.  *See* Ingram Dep. 216:21 – 217:11.

   ***The Severe and Unequal Burdens That Texas Imposes on Independents and NPPs, and the Harms It Inflicts on Voters, Cannot Be Justified by Any State Interest.***  There is nothing unique about Texas that makes it necessary for the Challenged Provisions to impose such severe

burdens. As set forth below, the undisputed facts demonstrate that Texas's signature requirements are far higher and its petitioning periods much shorter than necessary to protect its legitimate regulatory interests. And certain provisions – the primary screenout among them – are not justified by any state interest whatsoever. The burdens imposed by the Challenged Provisions ultimately fall upon voters, including Plaintiffs, who are regularly denied the opportunity to vote for candidates who represent their views. *See* Miller Decl. ¶¶ 16-18; Kleven Decl. ¶¶ 8-11; Palmer Decl. ¶¶ 22-23; Copeland Decl. ¶¶ 10-12; Prior Decl. ¶¶ 15-16. At a time when other parties and candidates are "clamoring for a place on the ballot," *Williams*, 393 U.S. at 31, these voters frequently have no choice but to vote for a PP candidate or not at all. The Challenged Provisions violate Plaintiffs' First and Fourteenth Amendment rights to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law.

## BACKGROUND

### A.    Relevant Factual Background

#### 1.    Texas Ballot Access History

When Texas began regulating ballot access in 1903, any political party could place its nominees on the ballot so long as it timely submitted them to the Secretary of State ("the Secretary"). Plaintiffs' Statement of Uncontested Material Facts ("SOUMF") ¶ 11. Independents seeking ballot access have always been required to submit petitions with minimum signature requirements, but Texas only extended those requirements to NPPs in 1967. Id. ¶ 14. Prior to that time, Texas's general election ballots were never overcrowded: indeed, Texas never had more than seven parties in total on a statewide ballot. Id. ¶ 17. The largest number of candidates on Texas's general election ballot was for the 1908 presidential election when five NPPs qualified. Id. No more than four NPP candidates for governor ever appeared on the Texas ballot in the same election, and that only occurred in five out of thirty-three elections. Id. ¶ 19. More often, the state's ballot

included no NPP or Independent gubernatorial candidates. The same trend held for U.S. Senate elections. Id. ¶¶ 19-20.

### 2.   Brief Overview of the Challenged Provisions

The Texas Election Code imposes various ballot access requirements that differ based on whether a candidate is from a PP, NPP, or an Independent. SOUMF ¶ 33. PPs must nominate candidates by primary election.  The primary winners are designated as the party's nominees and placed on the general ballot. See §§ 172.001, et seq.; SOUMF ¶ 34.  Since at least 1900, only the Democratic Party and Republican Party have qualified as PPs. Id. ¶ 34. Since 1972, Texas has spent millions of dollars in public funds to pay for the PPs' primary elections. Id. ¶ 37. Texas also enables PPs to certify primary election results electronically. Id. ¶ 38.

In contrast, NPPs (those that did not receive at least 20% of the total vote in preceding gubernatorial election) must nominate their candidates by convention. Id. ¶ 39. To qualify for ballot access, NPPs must show that their convention participants equaled at least 1% of the total vote in the preceding gubernatorial election. Id. at ¶ 41. Any shortfall must be made up by collecting voter signatures via petition, which must be submitted within 75 days of the convention date. Id. at ¶ 43.  Voters cannot sign petitions until after the primary election. Id. at ¶ 44.  Moreover, voters are disqualified from being able to participate in NPP conventions or sign petitions if they have already voted in a primary or signed another nomination petition.  Id. at ¶ 44.  Voters must sign the petition in person and provide their personal information and voter-registration details. Id. at ¶ 46. The petition form contains an "oath" certifying the voter's eligibility to sign the petition, which the circulator must read aloud to each voter at the time of signature. Id. at ¶ 47. In turn, the petition circulators must witness each voter signature, verify each signer's registration information, and sign an affidavit stating they believe each signature to be genuine, among other requirements.

Id. at ¶ 48.  Once an NPP submits its petition, the Secretary is not required to certify its nominees for ballot placement for approximately two months. Id. at ¶ 48.

The procedure for Independents to qualify for the ballot is similar, except that Independents may not nominate by convention and must submit nomination petitions signed by eligible voters. SOUMF ¶ 50. Moreover, Independent candidates for President face a signature requirement equal to at least 1 percent of the total vote for President (in Texas) in the preceding presidential election. Id. at ¶ 55. A presidential Independent's application must be filed with the Secretary no later than the second Monday in May of the presidential year–the second-earliest filing deadline in the nation–and the petition may not be circulated until after the presidential primary. Id. at ¶ 56. In 2020, a presidential Independent had only 69 days to collect signatures. Id. at ¶ 56.

### 3.    The Challenged Provisions Have Severe Impacts

When Texas first imposed the 1% signature requirement for Independent candidates in 1906, the threshold equaled 2,802 signatures. SOUMF ¶ 12. By 1968 when Texas extended the requirement to NPPs, the threshold equaled 14,259. Id. at ¶ 14. In 2022, Texas's 1% signature requirement amounts to 83,434 signatures for statewide Independents and NPPs, and 113,151 signatures for presidential Independents. Id. at ¶ 61. Because 30-50 percent of signatures may be deemed invalid by the Secretary, they must collect far more signatures than required to ensure they will meet the minimum threshold. Id. at ¶ 63. Therefore, as a practical matter, statewide Independents and NPPs seeking ballot access must hire paid petition circulators to complete a successful petition drive. Id. at ¶ 70. The undisputed facts show that a successful petition drive in 2022 will cost between $882,000 and $1.375 million. Id. at ¶ 73.

Texas's signature requirements are higher than the signature requirements imposed by every other state except California. SOUMF ¶ 62. But these requirements are singularly burdensome due to the temporal constraints that Texas law imposes.  Id. at ¶ 64. Only ten states

other than Texas limit the time that a new party has to collect signatures, and none are as restrictive as Texas. Id.  Moreover, Texas is unique in that it prevents Independents and NPPs from collecting voters' signatures until after the primaries. Id. at ¶ 74. This requirement not only gives Independents and NPPs a delayed start, but it also increases the likelihood that any signatures they do collect will be invalid.  Id. at ¶ 76.  Experienced professional petition organizers and campaign staff view Texas to be the most difficult state in which to conduct a successful petition drive, given the quantity of signature requirements and timing constraints. Id. at ¶ 77.

The oath that petition circulators must recite to potential signers adds further delay, and often intimidates or otherwise dissuades voters from signing. SOUMF ¶ 81. This could be avoided by permitting voters to sign nomination petitions electronically and utilize real-time, web-based validation procedures in use in other states. Id. at ¶¶ 84-86. Texas still mandates a non-digitized process. Id. at ¶ 65. Collecting in-person signatures is not only more laborious, but yields less quality results that are less amenable to later verification. Id. at ¶¶ 66, 82-83. At the completion of their petition drive, Independents and NPPs must review each physical piece of paper for compliance. Id. at ¶ 83. Finally, because the form allows only 10 signatures per page, thousands of petition pages must be collected, organized, photocopied, and physically hauled in boxes to the Secretary's office in Austin—all of which costs additional time and money. Id.

### 4.    The Challenged Provisions Burden Plaintiffs

These impediments have had real world effects and have prevented NPPs, Independents, and their supporters (including Plaintiffs), from being able to fully participate in Texas's electoral process.  SOUMF ¶¶ 87-128.  For example, although its affiliates have qualified for ballot access in other states, APTX has never qualified for the ballot in Texas. Id. at ¶ 106. Previously, it has tried and failed to achieve ballot access using the volunteer efforts of its members and supporters. Id. at ¶¶ 108-109. Based on APTX's prior experience, a successful petition effort would require

thousands of hours of labor and hundreds of thousands of dollars, which APTX does not have. Id. In recent election cycles, APTX members have opted to join or vote for another party because APTX is not ballot-qualified. Id. at ¶ 110. CPTX similarly lacks the money and resources needed to complete a successful petition drive, making ballot access in Texas a practical impossibility. Id. at ¶ 112. Rather than waste its limited resources on a futile effort to qualify, CPTX has made the strategic choice to instruct its own candidates to run as Independents in down-ballot races, which have much lower signature requirements. Id. GPTX and LPTX likewise lack the resources required to obtain ballot access by convention or nominating petition. Id. at ¶¶ 93, 103.

### B.    Procedural History

Plaintiffs commenced this action on July 11, 2019, (Dkt. No. 1), and filed the Amended Complaint on July 25, 2019. (Dkt. No. 14.)  Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on August 8, 2019. (Dkt. No. 16). On October 10, 2019, Plaintiffs filed a motion for preliminary injunction, which sought limited relief in the form of an order enjoining enforcement during the 2020 election cycle of the petitioning requirements and filing fees imposed by the newly-enacted § 141.041. (Dkt. No. 23.) On October 31, 2019, the Court held a hearing on the pending motions, (Dkt. No. 28), and on November 25, 2019, the Court entered its Order denying both motions. (Dkt. No. 30.) Defendants filed their Answer to the Amended Complaint on December 9, 2019. (Dkt. No. 31.)

## LEGAL STANDARD

### A.    Applicable Summary Judgment Standard

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000) (summary judgment proper if no reasonable juror could find for the non-movant). A dispute

is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

### B.   The Supreme Court's *Anderson-Burdick* Standard for Determining the Constitutionality of Ballot Access Provisions

The Supreme Court has long held that ballot access cases require careful consideration of "the facts and circumstances behind the law" and cannot be decided by applying a "litmus-paper test." *Storer v. Brown*, 415 U.S. 724, 730 (1974) (explaining that no simple rule can act as a "substitute for the hard judgments that must be made" in ballot access cases); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."). Ultimately, the key question that courts must address is whether "a reasonably diligent … candidate [can] be expected to satisfy" the statutory requirements. *Storer*, 415 U.S. at 742. To make that determination, the Supreme Court has established the following analytic framework:

> [a court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). This framework establishes a "flexible standard" in which "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth

Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).[4]   The Supreme Court has emphasized that "[h]owever slight [the] burden may appear. . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

C.     **The 47-Year-Old Decision in** *American Party of Texas v. White* **Is Not Controlling**

The Supreme Court's decision in *American Party of Texas v. White*, 415 U.S. 767 (1974), does not control or set an applicable standard here.  As a preliminary matter, *American Party of Texas* was decided prior to *Anderson* and *Burdick*, and thus the Court did not apply the more "stringent framework" prescribed by those cases. *Cf. LULAC v. Hughes*, 978 F.3d 136, 146 n.6 (5th Cir. 2020) (acknowledging that *Anderson-Burdick* prescribes a "relatively more stringent" analysis than prior Supreme Court precedent governing absentee ballot procedures); *Graveline v. Johnson*, 747 F. App'x 408-414 (6th Cir. 2018) (unpublished) (citing *Anderson*, 460 U.S. at 817 (Rehnquist, J. dissenting) (describing the less demanding legal standard applied in cases decided prior to *Anderson*)).

In addition, the holding in *American Party of Texas* could not account for Texas's statutory provisions as they apply today.  For example, Texas's one-percent signature requirement amounted to only 22,000 signatures in 1972, *see American Party of Texas*, 415 U.S. at 777, whereas in 2022

---

[4] The *Anderson-Burdick* analysis applies both to First Amendment and Equal Protection claims. *See Richardson v. Texas Secretary of State*, 978 F.3d 220, 233-35 (5th Cir. 2020) (discussing *Anderson-Burdick* analysis and concluding that it applies to all "[c]onstitutional challenges to specific provisions of a State's election laws" under "the First and Fourteenth Amendments," including Equal Protection claims) (citation omitted); *Texas Democratic Party v. Abbott*, 978 F.3d 168, 194 (5th Cir. 2020) (observing that there are "noteworthy reasons" for applying *Anderson-Burdick* analysis to Equal Protection claims); *see also Anderson*, 480 U.S. at 786 n.7 (observing that while Court decided case on First Amendment grounds, without conducting separate Equal Protection analysis, it relied on several cases decided on Equal Protection grounds).

a statewide Independent or NPP needs 83,434 signatures to meet that threshold.  Furthermore, the one-percent signature requirement did not even apply to NPPs until 1968, *see* TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968), and the record in *American Party of Texas* disclosed that two such parties had complied with it in 1972. *See American Party of Texas*, 415 U.S. at 779. The Court thus concluded that it was not "immediately obvious" that the one-percent signature requirement "imposes insurmountable obstacles to fledgling political party efforts to generate support among the electorate and to evidence that support within the time allowed." *Id.* at 784. Here, by contrast, the undisputed facts demonstrate that the burden imposed by the one-percent signature requirement has steadily increased over time, such that statewide Independents and NPPs cannot comply except by spending vast sums of money to hire petition circulators.  *See* Hall Decl. ¶¶ 5-17; Bilyeu Decl. ¶¶ 5-7, 9-10, 12, 22-23, 35; Palmer Decl. ¶¶ 6, 9-10, 17, 20; Copeland Decl. ¶¶ 6-8; Prior Decl. ¶¶ 7-10, 12; Kafoury Decl. ¶¶ 5-19; Buchanan Decl. ¶¶ 7-16; Verney Decl. ¶¶ 4, 6, 14, 15; Harrison Decl. ¶¶ 4-9; King Decl. ¶¶ 7-12, 14; Pool Decl. ¶¶ 14-22, 25-27.[5]  These facts were not before the Court in *American Party of Texas* – they did not exist yet – and, as set forth below, they establish that Texas's signature requirement, as applied in combination with the other Challenged Provisions, imposes a severe and unequal burden on Plaintiffs and functions as a *de facto* financial barrier to their participation in Texas's electoral process.  *See Libertarian Party of Texas v. Fainter*, 741 F.2d 728, 730 (5th Cir. 1984) (acknowledging that underpinnings of Texas's statutory provisions may have changed since 1974).

Finally, *American Party of Texas* did not address, much less decide, the claims that Plaintiffs assert here. Plaintiffs assert that the Challenged Provisions are unconstitutional as

---

[5] For example, in 2022 a successful statewide petition drive will cost approximately $882,000 to $1.375 million.  *See* King Decl. ¶¶ 8-11; Pool Decl. ¶¶ 25-26.

applied in conjunction with one another, and many of the Challenged Provisions were not at issue in *American Party of Texas*. Am. Compl. ¶¶ 90,92; *see Storer*, 415 U.S. at 737 ("a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights"); *Pilcher v. Rains*, 853 F.2d 334, 336 (5th Cir. 1988) (same). Plaintiffs' claims are therefore legally distinct from the claims asserted in *American Party of Texas*. Furthermore, the central basis for those claims – that Texas imposes severe and unequal burdens on Plaintiffs by requiring that they obtain an ever-increasing number of signatures on paper nomination petitions in the same fixed period of time, at their own expense, while guaranteeing the PPs' nominees' automatic access to the ballot at taxpayer expense – also was not at issue in *American Party of Texas*.[6]

## ARGUMENT

**I.    The Challenged Provisions Implicate Plaintiffs' Fundamental First and Fourteenth Amendment Rights**

The Challenged Provisions "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("Both of these rights, of course, rank among our most

---

[6] The Court did not address the financial burden imposed by the one-percent signature requirement except in the context of an Equal Protection challenge to the newly-enacted McKool-Stroud Primary Financing Law of 1972, which authorized Texas to use public funds to pay for PPs' primary elections but not for NPPs' ballot qualification processes. *American Party of Texas*, 415 U.S. at 791-92. The Court stated that it was "unconvinced, *at least based upon the facts presently available*, that this financing law is an 'exclusionary mechanism' which 'tends to deny some voters the opportunity to vote for a candidate of their choosing' or that it has 'a real and appreciable impact on the exercise of the franchise.'") *Id.* at 794 (quoting *Bullock*, 405 U.S. at 144 (emphasis added)). Thus, while the Court concluded that the statute did not violate the Equal Protection Clause, it did not address Plaintiffs' claim that the necessary cost of conducting a petition drive constitutes an impermissible burden on First Amendment rights.

precious freedoms."). Laws that exclude candidates from the ballot "burden[] voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for likeminded citizens." *Anderson*, 460 U.S. at 787-88. In addition, the Challenged Provisions burden Plaintiffs' "right . . .to create and develop new political parties." *Norman*, 502 U.S. at 288.[7] These rights are "of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433; *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws").[8]

## II.   The Challenged Provisions Impose Severe Burdens on Plaintiffs' Fundamental Rights

Plaintiffs have developed a comprehensive evidentiary record demonstrating that the Challenged Provisions make it prohibitively difficult and expensive for Independents and NPPs to

---

[7] *See also Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) ("The right to associate with the political party of one's choice is an integral part of [the] basic constitutional freedom" to associate for the "advancement of political beliefs and ideas."). This right "derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Norman*, 502 U.S. at 288. Laws that limit political parties' access to the ballot "thwart this interest . . . . " *Id.*; *see also Dart v. Brown*, 717 F.2d 1491, 1499-500 (5th Cir. 1983) ("If the party has no candidate on the ballot, the members' acts of political association can be individually enriching, but cannot directly serve the tangible end of securing a representative voice in government.").

[8] The right to vote is undermined if voters cannot cast their votes *effectively* – meaning for a candidate that represents their preferences. *See Williams*, 393 U.S. at 30; *Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."); *Dart*, 717 F.2d at 1499 ("When a new party and its candidate are denied access to the ballot, the party members are denied the right to cast their votes for the candidate whom they support.").

access Texas's ballot.  Whether viewed in isolation or cumulatively, the Challenged Provisions impose severe and unequal burdens on Plaintiffs' rights.  *See Nader v. Connor*, 332 F. Supp. 2d 982, 987 (W.D. Tex. 2004) (recognizing that courts must analyze the "totality" of the burden that election laws impose as applied in combination) (citing *Storer*, 415 U.S. at 737), *aff'd*, 388 F.3d 137 (5th Cir. 2004); *see, e.g.*, *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (same); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) (same).

### A.     The Number of Signatures Required by Texas Is Excessive

To qualify for Texas's ballot in 2020, a statewide Independent or NPP had to submit 83,434 valid signatures.[9]  To qualify in 2024, a presidential Independent must submit 113,151 valid signatures.  In practice, however, Independents and NPPs actually must collect many more signatures than the requirement, because as many as 30-50 percent of the gathered signatures are typically invalid.  *See* Pool Decl. ¶¶ 18, 21; Benedict Decl. ¶ 22; Redpath Decl. ¶ 26; Buchanan Decl. ¶ 8; Verney Decl. ¶ 11; Kafoury Decl. ¶ 6.  These requirements are excessive and are higher, by far,[10] than the signature requirements imposed by every state other than California.[11]  While not dispositive, this comparison is an important factor in determining whether Texas's signature

---

[9] Texas's signature requirements are not reasonable simply because they are based on a percentage of votes cast in prior elections.  The 30,000-signature requirement in *Graveline*, for example, was found to be severely burdensome even though it amounted to less than one percent of the vote cast in the preceding election. *See Graveline*, 992 F.3d at 548 (Griffin, J., dissenting); *see also Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016) (finding Georgia's one-percent signature requirement severely burdensome), *aff'd*, 674 Fed. Appx. 974 (11th Cir. 2017).

[10] New York, the state with the next-highest signature requirement, requires only 45,000 signatures. *See* Winger, *2024 Presidential Petitioning Requirements*, Ballot Access News (July 2021 – Vol. 37, No. 2), http://ballot-access.org/2021/07/30/July-2021-ballot-access-news-print-edition/ (last visited July 22, 2021).

[11] *See* Richard Winger, *2024 Presidential Petitioning Requirements*, Ballot Access News (July 2021 – Vol. 37, No. 2), http://ballot-access.org/2021/07/30/July-2021-ballot-access-news-print-edition/ (last visited July 22, 2021) (identifying signature requirement to qualify for presidential ballot in 2024).

requirements impose a "severe" burden on Plaintiffs' rights.  *See Williams*, 393 U.S. at 47 & n.10 (Harlan, J. concurring) (comparing Ohio's signature requirement to "the overwhelming majority of other States" and finding it "clearly disproportionate to the magnitude of the risk that [Ohio] may properly act to prevent…."); *Lee*, 463 F.3d at 768-69 (finding Illinois's signature requirement "severe" in part because it "exceeds those of all other states."); *Graveline v. Benson*, 992 F.3d 524, 540 (6th Cir. 2021) (finding Michigan's signature requirement "severe" in part because "in terms of absolute numbers only five states have higher requirements.").

Texas's signature requirements are not just excessive when compared with other states, they are also excessive when considered in connection with the supposed justifications for the provisions: avoiding crowded ballots and voter confusion while requiring parties and candidates to demonstrate a modicum of support among voters.  The empirical evidence unequivocally demonstrates that states can avoid overcrowded ballots by requiring as few as 5,000 valid signatures.  *See Winger Report*, ¶¶ 14-15, 19-21 & App. C.  Consequently, Texas's high signature requirements are not reasonably tailored to ensure that ballot-qualified parties have a modicum of support among the electorate.  LPTX and GPTX – both of which have struggled to run successful signature drives to gain ballot access – routinely run candidates who receive hundreds of thousands or more than one million votes once they are on the ballot.  *See* Bilyeu Decl., ¶¶ 5-7, 10, 26-32; Palmer Decl., ¶¶ 9, 12-14, 16-17.

**B.      The Costs of Conducting a Successful Petition Drive Functions as a *De Facto* Financial Barrier to Independents' and NPPs' Participation in Texas's Electoral Process**

In the 47 years since *American Party of Texas* was decided, Plaintiffs are unaware of any statewide Independent or NPP that has successfully completed a petition drive except by spending substantial sums of money to do it.  *See Storer*, 415 U.S. at 742 (observing that "past experience" is useful to determining whether "a reasonably diligent … candidate [can] be expected to satisfy

16

the signature requirements….”); *see also* Hall Decl. ¶¶ 5-17; Palmer Decl. ¶ 6; Buchanan Decl. ¶ 13; Verney Decl. ¶¶ 4,6,14,15,18; Kafoury Decl. ¶ 18; Bilyeu Decl. ¶ 23; Harrison Decl. ¶ 6; King Decl. ¶¶ 8-11. The record demonstrates that volunteer-led efforts fail, and statewide petition drives succeed only when enough paid petition circulators can be hired. *See* Kafoury Decl. ¶ 19; Buchanan Decl. ¶¶ 9-10, 12; Palmer Decl. ¶ 9; Bilyeu Decl. ¶¶ 5-10; Benedict Decl. ¶ 14; King Decl. ¶¶ 12, 14; Pool Decl. ¶ 27.

The cost of conducting a statewide petition drive is staggering. When GPTX first qualified for the ballot in 2000, its petition drive cost approximately $80,000. *See* Palmer Decl. ¶ 6. This substantial sum exceeded the fledgling party’s limited resources and was paid not by GPTX but by the campaign of its presidential ticket, Ralph Nader and Winona LaDuke. *See id.* In 2004, when LPTX last conducted a petition drive, the cost was $140,000 and the party went into debt to fund the effort. *See* Bilyeu Decl. ¶ 23; Benedict Decl. ¶ 19. Fourteen years later, in 2018, the cost of a statewide petition drive for a statewide Independent had increased to $587,500 if there were no primary runoff, and $797,000 if there were a primary runoff (the latter figure being higher due to the shortened, 30-day petitioning period). *See* Harrison Decl. ¶ 6. Four years later, the cost has climbed still higher: the Serve America Movement (“SAM Party”) is currently seeking to qualify for Texas’s ballot in 2022, and has obtained proposals from three separate petitioning firms quoting prices ranging from $882,000 to $1.375 million. *See* King Decl. ¶¶ 8-11.

Plaintiffs do not have the funds necessary to pay for a statewide petition drive. Nor do they have any reasonable expectation of raising such exorbitant sums. And since volunteer efforts cannot succeed, the cost of conducting a statewide petition drive is a *de facto* financial barrier to Plaintiffs’ participation in Texas’s electoral process. Indeed, for non-wealthy candidates and

parties such as Plaintiffs, that barrier is absolute. *See* Prior Decl. ¶¶ 8-9, 12; Copeland Decl. ¶ 7; Palmer Decl. ¶ 20; Bilyeu Decl. ¶ 35; Miller Decl. ¶ 19.

The Supreme Court has squarely held that states may not condition participation in their electoral processes on financial status. *See Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666 (1966) ("a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard."). The Court has applied the same reasoning to candidates and political parties. *See Bullock*, 405 U.S. 134 (striking down "patently exclusionary" primary election candidate filing fees); *Lubin*, 415 U.S. 709 (striking down lesser filing fees in the absence of non-monetary alternatives). In *Bullock*, the Court expressly rejected the state's claim that filing fees were a reasonable means of limiting the ballot to "serious" candidates. *See Bullock*, 405 U.S. at 145-46. Filing fees are "extraordinarily ill-fitted" to serve that interest, the Court concluded, because the evidence showed that non-wealthy candidates "were *unable*, not simply *unwilling*," to pay them, and consequently it was uncontested that the fees "exclude legitimate as well as frivolous candidates." *Id.* at 146; *see also Lubin*, 415 U.S. at 717 ("Filing fees, however large, do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office.").[12]

---

[12] Federal courts have uniformly struck down state laws that require voters, candidates or political parties to bear the cost of the state's "legislative choice" regarding the regulation of elections. *Bullock*, 405 U.S. at 148; *see, e.g.*, *Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486 (E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3rd Cir. 2016); *Belitskus v. Pizzingrilli*, 343 F.3d 632, 644 (3rd Cir. 2003); *Republican Party of Arkansas*, 49 F.3d 1289 (8th Cir. 1995); *Dixon v. Maryland State Bd. of Elections*, 878 F.2d 776 (4th Cir. 1989). Several courts have specifically held it unconstitutional for states to require that political parties pay to validate the signatures on nomination papers they are required by law to submit. *See, e.g.*, *Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir. 1992); *McLaughlin v. North Carolina Board of Elections*, 850 F. Supp. 373 (M.D. N.C. 1994), *aff'd on other grounds*, 65 F.3d 1215 (4th Cir. 1995); *Clean-Up '84 v. Heinrich*, 590 F. Supp. 928 (M.D. Fl. 1984, *aff'd on other grounds*, 759 F.2d 1511 (11th Cir.1985).

Like the filing fees in *Bullock*, the cost of conducting a statewide petition drive in Texas is "patently exclusionary." *Bullock*, 405 U.S. at 143. And like the plaintiffs in *Bullock*, the evidence shows that Plaintiffs here are not simply unwilling but unable to pay that cost. Simply put, the cost of conducting a petition drive is no less a barrier to Plaintiffs' participation in Texas's elections than the filing fees were to the plaintiffs in *Bullock* and *Lubin*.[13]

## C. The Extreme Time Constraints Imposed by Texas on Collecting Signatures Impose Additional Burdens on Plaintiffs' Fundamental Rights

The ever-increasing number of signatures that Texas requires Independents and NPPs to obtain in the same fixed period of time is a critical factor that contributes to the severity of the burden imposed by the Challenged Provisions. No other state places such extreme time constraints upon Independents and NPPs who seek access to the ballot.

When Texas's one-percent signature requirement first took effect, in 1906, it translated to 2,802 signatures for statewide office.[14] When the requirement was first applied to NPPs, in 1968, it translated to 14,259 signatures.[15] When *American Party of Texas* arose, in 1972, the requirement translated to 22,000 signatures. *See American Party of Texas*, 415 U.S. at 777. And today, 47 years after that case was decided, the requirement has nearly quadrupled for statewide Independents and NPPs – they must submit 83,434 valid signatures in 2022 – and the requirement

---

[13] Moreover, federal courts routinely rely on the costs associated with conducting petition drives to support a finding of a "severe" burden, even when those costs pale in comparison to the costs at issue here. *See, e.g.*, *Graveline v. Benson*, 430 F. Supp. 3d 297, 309, 311 (E.D. Mich. 2019) (finding burden "severe" where evidence showed that "all-volunteer efforts 'most often fail'" and independent candidates for statewide office therefore must "spend significant money for a professional signature-gathering firm on top of the money associated with volunteer efforts."), *aff'd*, 992 F.3d 524, 540 (6th Cir. 2021); *Cowen v. Raffensperger*, No. 1:17-cv-04660 (N.D. Ga., March 29, 2021), Dkt. 159 at 26; *Green Party of Ga.*, 171 F. Supp. 3d at 1350-51 (N.D. Ga. 2016), *aff'd*, 674 Fed. Appx. 974 (11th Cir. 2017).

[14] *See* Hall Decl. ¶ 3, Ex. 6.

[15] *See* Hall Decl. ¶ 3, Ex. 7.

for presidential Independents has quintupled – they must submit 113,151 valid signatures in 2024. Yet the time allowed for obtaining these signatures remains fixed: NPPs have just 75 days, *see* § 181.005(a), and statewide Independents have 107 days. *See* §§ 142.004-06, 142.009 (petitioning period starts after the March 1, 2022 primary election and ends 30 days after the May 24, 2022 primary runoff election). Independents unlucky enough to compete in a race with a primary runoff, meanwhile, have just 30 days to obtain their signatures. *See* § 142.009(1). And in 2024, presidential Independents will have just 68 days to collect their 113,151 valid signatures. *See* §§ 192.032(c),(g); 41.007(c) (petitioning period begins March 6, 2024 and ends May 13, 2024).

The time constraints that Texas places upon Independents and NPPs makes the burden imposed by the Challenged Provisions far more severe than any other state's requirements. Of the 39 states that have established procedures for a group to qualify as a political party by submitting a petition, 28 impose no time limitation whatsoever – the group can take as long as it needs to obtain the required number of signatures. Of the remaining 10 states that impose a time limit, none are anywhere nearly as restrictive as Texas. Georgia comes closest, and it is far less restrictive, requiring a prospective party to obtain signatures equal to 1 percent of registered voters – currently 76,389 signatures – within a 15-month petition period. *See* Hall Decl. ¶ 24. The other nine states are even less restrictive, because their signature requirements are much lower than Georgia's and their petitioning periods are much longer than Texas's. *See id.*

### D. Texas's Unnecessarily Time-Consuming and Inefficient Petitioning Procedures Exacerbate the Burdens on Plaintiffs' Fundamental Rights

As was the case 116 years ago, when Texas's election procedures were first adopted in 1905, Independents and NPPs must obtain voters' signatures in person, by hand, on paper nomination petitions. *See* Ingram Dep. 63:3 – 64:20. That procedure may have been adequate in 1906, when the signature requirement amounted to 2,802 signatures, but it is ill-suited to the task

today, when statewide Independents and NPPs must submit 83,434 valid signatures, and presidential Independents must submit 113,151 valid signatures.

Under the best of circumstances, collecting signatures by hand is inherently time-consuming, labor-intensive and expensive.  *See* Benedict Decl. ¶¶ 20-25; Buchanan Decl. ¶¶ 15-16; Verney Decl. ¶¶ 11-12, 16-17; Kafoury Decl. ¶¶ 12-15.  Voters are often unwilling to stop in public and provide their signatures and personal information to an unknown petition circulator, even if they support the right of an Independent or NPP to participate in an election.  *See* Kafoury Decl. ¶ 13; Benedict Decl. ¶ 13.  Other potential signers may be confrontational, threatening or abusive.  *See* Kafoury Decl. ¶ 12.  Additionally, political adversaries or unscrupulous petition circulators can sabotage paper nomination petitions by deliberately signing ineligible or fraudulent names. *See* Buchanan Decl. ¶ 11.  Local officials and property owners also frequently force petition circulators to relocate, losing valuable time in the process, even when they are engaged in First Amendment protected conduct. *See* Benedict Decl. ¶ 21; Kafoury Decl. ¶ 11.  All of this makes petitioning a physically challenging and mentally taxing activity that few people are capable of doing successfully.  *See* Benedict Decl. ¶¶ 16-17, 21; Kafoury Decl. ¶ 12. It is even more so in Texas.  *See* Benedict Decl. ¶¶ 14, 20-21; Buchanan Decl. ¶¶ 7-10; Verney Decl. ¶¶ 7-9; Kafoury Decl. ¶¶ 7-8, 16-17.  To conduct a statewide petition drive in Texas, Independents and NPPs must print thousands of pages of petitions, at their own expense, circulate them throughout the state, retrieve and review them on a daily basis.[16] *See* Benedict Decl. ¶ 24; Verney Decl. ¶ 17; Buchanan

---

[16] At the completion of their petition drive, Independents and NPPs must obtain their thousands of pages of petitions from circulators throughout the state, review them for compliance, organize them into in multiple boxes and deliver them by truck or van to the Secretary's office in Austin. *See* Benedict Decl. ¶¶ 13, 18, 24-25; Buchanan Decl. ¶ 16; Prior ¶ 11; Redpath Decl. ¶ 27; Verney Decl. ¶¶ 12, 16-17

Decl. ¶ 16.  Such an effort strains the resources of the most well-funded campaigns.  *See* Verney Decl. ¶¶ 4,6,8,18; Buchanan Decl. ¶¶ 10,13.

Petitioning is especially difficult in Texas due to its "primary screenout" provisions, which prohibit Independents and NPPs from obtaining voters' signatures until after the primary election (or, for Independents in races with a primary runoff, after that), and prohibit voters who vote in a primary election from signing petitions.  *See* §§ 181.006(j), 181.063, 142.009(1); §§ 181.006(g), 142.009(2).  No other state imposes a primary screenout, and it significantly increases the burden and expense of conducting a petition drive in Texas.  *See* Pool Decl. ¶ 18; Redpath Decl. ¶ 22; Benedict Decl. ¶ 22; Buchanan Decl. ¶ 15; Kafoury Decl. ¶ 14.  As an initial matter, the primary screenout makes petitioning on primary election day prohibited.  In other states, that is by far the most productive petitioning day.  *See* Redpath Decl. ¶¶ 6,9,10,13; Benedict Decl. ¶ 6; Pool Decl. ¶ 18.  Furthermore, to enforce its primary screenout, Texas – again, unlike any other state – requires that petition circulators recite an oath to each potential signer that confirms they did not vote in a primary election.  *See* §§ 141.064(1), 142.008, 181.006(f) and 192.032(f).  The oath is lengthy and legalistic, and reciting it to every potential signer not only takes substantial time but also dissuades many people from signing.  *See* Redpath Decl. ¶ 25; Benedict Decl. ¶ 23; Pool Decl. ¶ 19; Kafoury Decl. ¶ 13.[17]  Despite reciting the oath, petition circulators have no way to confirm whether potential signers voted in the primary, and many people sign even though they did, rendering their signatures invalid.  *See* Redpath Decl. ¶ 26; Benedict Decl. ¶ 22; Pool Decl. ¶ 18; Kafoury Decl. ¶

---

[17] A trained petition circulator might collect 10 signatures per hour, on average, with a validity rate of approximately 70 percent.  See Redpath Decl. ¶¶ 22, 26; Kafoury Decl. ¶ 6; Pool Decl. ¶ 21; Benedict Decl. ¶ 17; Verney Decl. ¶ 10; Prior Decl. ¶ 11.  This translates to a total of 400 raw signatures, or 280 valid signatures, in a full-time, 40-hour work week. To conduct a successful statewide petition drive, therefore, Independents and NPPs must employ dozens of full-time petition circulators, which as discussed above comes at significant expense.

14.  The primary screenout thus makes it necessary to collect an even greater number of signatures than is necessary in other states, to account for these invalid signatures.  *See* Redpath Decl. ¶ 26; Benedict Decl. ¶¶ 11, 22; Pool Decl. ¶ 18; Kafoury Decl. ¶ 14.

Once signatures are collected, the requirement that petition circulators review them and execute a notarized affidavit attesting that they verified each signer's registration status and believe the signatures to be genuine and the related information correct adds yet another burdensome and time-consuming step to the process.  *See* §§ 141.064-65; *see also* Kafoury Decl. ¶ 15; Verney Decl. ¶ 17; Benedict Decl. ¶ 25. As a result, many signatures are impossible to verify, making it necessary to collect even more signatures to compensate for those that are illegible.

### E.   The Newly-Enacted Filing Fees and Petitioning Requirements That § 141.041 Imposes Compound the Already Severe Burdens on NPPs

In its November 25, 2019 Order (Dkt. No. 30), this Court declined to preliminarily enjoin enforcement of the new filing fee and petitioning requirements that Texas imposed on NPPs in 2019 pursuant to § 141.041.[18]  Plaintiffs respectfully submit, however, that the evidentiary record shows that § 141.041 imposes substantial additional burdens on Plaintiffs and is not reasonably tailored to further any state interest.  Instead, as explained *infra* at Part III.B, it is undisputed that § 141.041 allows Texas to *profit*, financially, from NPPs' participation in the electoral process.

Although § 141.041 permits candidates to submit a petition in lieu of paying a filing fee, the evidence shows that the provision has already had an exclusionary impact, and one that falls most heavily on non-wealthy candidates and their supporters.  *See Bullock*, 405 U.S. at 144; *Lubin*,

---

[18] Section 141.041 was not enforced in 2020 as a result of two decisions of the Supreme Court of Texas.  *See In Re Texas House Republican Caucus PAC, et al, Relators*, No. 20-0663 (Sept. 5, 2020); *In Re: the Green Party of Texas, et al.*, No. 20-0708 (Sept. 15, 2020).  The decisions did not invalidate § 141.041, however, *see* Bilyeu Decl. ¶ 34, and consequently it remains in effect and enforceable in 2022 and subsequent election cycles.  *See* § 141.041.

415 U.S. at 717-18.  When GPTX was last ballot-qualified, in 2016, it ran 33 candidates, but when it regained ballot access in 2020 it ran only seven (in addition to its presidential ticket) – and those candidates only qualified after the Supreme Court of Texas ruled that § 141.041 had been improperly enforced.  *See* Palmer Decl. ¶¶ 15,19.  LPTX candidates were also excluded, notwithstanding the intervention of the Supreme Court of Texas.  *See* Benedict Decl. ¶¶ 26-28. Section 141.041 substantially increases the burden that the Challenged Provisions impose on NPPs, and as explained *infra* at Part IV.A, the provision is not tailored to serve any legitimate state interest.

## III.    The Challenged Provisions Impose Unequal Burdens on Plaintiffs

It is well settled that states may provide "alternative paths" to the ballot for Independents, NPPs and PPs without violating the Equal Protection Clause.  *Jenness*, 403 U.S. at 440-41 (observing that no particular alternative "can be assumed to be inherently more burdensome than the other.").   In this case, however, Plaintiffs do not rely on assumptions, but rather a comprehensive evidentiary record demonstrating that the Challenged Provisions operate as a *de facto* financial barrier to Independents' and NPPs' participation in Texas's electoral process, while the alternative path available to PPs guarantees their nominees automatic access to the general election ballot at taxpayer expense. Ballot access in Texas costs PPs nothing; for Independents and NPPs, it is cost-prohibitive. The Challenged Provisions impose many additional burdens that fall on Independents and NPPs alone, and place them at a significant disadvantage to PPs. Such a scheme violates the Equal Protection Clause. *See Anderson*, 460 U.S. at 793 ("Our ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'") (quoting *Clements v. Fashing,* 457 U.S. 957, 964 (1982) (plurality opinion)).

24

A.      **Texas Guarantees PPs' Nominees Ballot Access at Taxpayer Expense but Requires Independents and NPPs to Bear the Prohibitive Cost of Complying With the Procedures They Must Follow**

In sharp contrast to the inherently laborious, inefficient and prohibitively expensive petitioning procedures that Independents and NPPs must follow to access the ballot, Texas guarantees PP nominees automatic access to the general election ballot once they are selected in taxpayer-funded primary elections.  Texas has used taxpayer funds to pay for PPs' primary elections in each election cycle since 1972.  *See American Party of Texas*, 415 U.S. at 791-92; Ingram Dep. 28:4 – 29:3; 136:1 – 136:21.  In 1972, Texas spent approximately $3 million in taxpayer funds on the PPs' primary elections. *See American Party of Texas*, 415 U.S. at 792. In each election cycle since then, Texas has spent millions more, culminating with the 2020 election cycle, when it spent approximately $18 million in taxpayer funds on the PPs' primary elections. *See* Ingram Dep. 136:1 -136:21.

PPs use the taxpayer funds they receive from the state for virtually every expense they incur in connection with their primary elections. This includes but is not limited to precinct workers and other elections officials, transportation, polling place rentals, office rentals, office personnel, office equipment such as computers, printers and telephones, office supplies such as pens, pencils and paper, and postage, among many other expenses.  *See* Hall Decl. ¶ 26; Ingram Dep. 88:4 – 105:4. In short, PPs need not pay for so much as a paper clip to place their nominees on the ballot. Taxpayers pick up the bill.

Texas does not pay any taxpayer funds to facilitate Independents' and NPPs' compliance with the procedures they must follow to access the ballot. *See* Ingram Dep. 50:14 – 51:5. Texas does not even provide paper copies of the petitions they are required by law to circulate.  *See* Ingram Dep. 198:18 – 199:4; Benedict Decl. ¶¶ 12, 24; Kafoury Decl. ¶ 15.

**B.    Texas Permits PPs to Retain the Filing Fees Their Candidates Pay but Remits the Filing Fees That NPP Candidates Pay to the State's General Fund**

When candidates seeking access to the PPs' primary election ballot pay filing fees pursuant to § 172.021(b), the fees are paid to the party's state or county chair, depending on the office. *See* § 172.022(a).  The funds are deposited in a designated account and the PP uses them to pay costs associated with its primary elections.  *See* §§ 173.031, 173.032; Ingram Dep. 41:2 -41:13.  When candidates seeking the nomination of an NPP pay the filing fee required by § 142.041, however, those fees – which are identical to the fees paid by PP candidates, *see* § 141.041(b) – are paid to the Secretary.  *See* § 141.041(a)(2).  The Secretary deposits those fees in the state's general fund. *See* § 141.041(c). And because Texas does not incur any expenses associated with NPPs' participation in its elections, *see* Ingram Dep. 50:14 – 51:5, the state therefore profits, financially, from each filing fee that NPP candidates pay.[19]  *See* Ingram Dep. 51:6 – 51:10; 49:20 – 49:22.

**C.    Texas Prohibits Independents and NPPs From Soliciting Voters' Signatures Until After the Primary Election and Prohibits Primary Election Voters From Signing Petitions**

The primary screenout places Independents and NPPs at a significant disadvantage to PPs because it prohibits them from obtaining voters' signatures on petitions prior to the primary election, and prohibits primary election voters from signing their petitions.  *See* §§ 181.006(j), 181.063, 142.009(1); §§ 181.006(g), 142.009(2). In addition to limiting the pool of voters eligible to sign petitions and increasing the rate of invalid signatures that Independents and NPPs obtain, *see supra* at Part II.D, this gives PPs the right to win voters' support – and their partisan affiliation

---

[19] LPTX ran 87 candidates for federal and state office in 2020; had they all paid the fees prescribed by § 141.041, Texas would have realized $149,450 in profit from their candidacies.  *See* Bilyeu Decl. ¶ 34.

– at a time when Independents and NPPs are statutorily prohibited from affiliating with them by obtaining their signatures on a petition.

### D.   Texas Has Adopted Electronic Procedures for PPs but Has Not Adopted Similar Procedures for Independents and NPPs

Texas enacted several provisions that require the Secretary to adopt and implement electronic procedures that facilitate the PPs' administration of their primary elections.  *See* § 172.029(b).  For example, PP chairs are required to submit information to the Secretary about each candidate who applies to appear on the primary election ballot, but Texas enables them to do so electronically.  *See id.*  It also requires the Secretary to maintain an online database of that information, which must be made accessible to the party chairs.  *See id.*  Texas also enables PPs to certify primary election results electronically.  *See* §§ 172.116, 172.117(a), 172.122.  The foregoing provisions apply only to PPs, and the procedures they establish are not available to Plaintiff NPPs.[20]

More important, the petitioning procedures that Independents and NPPs must follow have not been updated or improved in the 116 years since Texas first adopted them in 1905.  *See* Ingram Dep. 62:23 – 64:4, 216:21 – 217:11.  And the procedures themselves – obtaining signatures by hand on paper nomination petitions – were hundreds of years old then.  *See generally*, Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, YALE L. J., Vol. 96: 142 (1986).  Nonetheless, the Secretary has not taken any steps to reduce the burdens the procedures impose on Independents and NPPs. *See* Ingram Dep. 216:21 – 217:11.  The Secretary has not explored whether less burdensome alternatives are available.  *See id.*

---

[20] The Secretary avers that these procedures are available to NPPs, *see* Ingram Dep. 150:2 – 155:15 154:15 – 155:10, but at present the Secretary has not provided Plaintiff NPPs the necessary credentials.  *See* Bilyeu Decl. ¶ 39.

### E.    The Challenged Provisions Limit Independents' and NPPs' General Election Cycle to as Short as 68 Days

Once an Independent or NPP submits its petitions, the Secretary is not required to certify them for placement on the ballot for approximately two months – or 68 days before the general election.  *See* §§ 142.010(b), 181.007(b), 192.033(b).  Therefore, unlike PP nominees, who are identified as soon as the primary election results are certified, Independents and NPPs are unable to compete in the election as ballot-qualified contestants until much later.  This significantly hampers Independents' and NPPs' ability to fundraise and campaign, because potential donors and voters do not know whether they will actually be on the ballot.  *See* Buchanan Decl. ¶¶ 5-6, 16; Harrison Decl. ¶ 7.  As a result, Texas's statutory scheme effectively shortens the general election for Independents and NPPs to just 68 days.  This additional burden is wholly unnecessary, because the Secretary is authorized to presume the validity of signatures submitted with the proper affidavit, and also to validate signatures by statistical sample. *See* §§ 141.065(b), 141.069.

### F.    The Challenged Provisions Impose Additional, Unique, and Unequal Burdens on Independents

#### 1.    Independents cannot know in advance when the petitioning period begins.

Independents who wish to run for office in Texas face a unique quandary, unlike Independents in any other state: they do not know when their petitioning period will begin until it actually starts.  If both PPs select their nominees in the primary election, then the Independent's petitioning period begins the next day.  *See* § 142.009(1).  If either PP has a runoff primary election, however, the Independent's petitioning period starts the day after that.  *See id.*  The uncertainty created by this provision imposes a considerable burden by itself.  A petition drive – and especially a petition drive for statewide office – is a massive undertaking that must be completed in a limited period of time. *See supra* at Part II.B.C.D. Because Independents do not know in advance when that time period will begin, however, they cannot take reasonable measures to ensure their petition

drive is ready for launch on day one.  *See* Harrison Decl. ¶¶ 5,8; Kafoury Decl. ¶ 9; Pool Decl. ¶¶ 14-16.  Most important, Independents cannot assemble a full team of petition circulators to be at the ready, because petition circulators are paid on a per-signature basis, and the only way to ensure their availability is to pay a substantial premium to compensate them for their time in the event that the petition drive does not start until after the primary runoff. *See* Harrison Decl. ¶¶ 5, 8; Kafoury Decl. ¶ 9; Pool Decl. 14-16, 21-23, 26.

Section 142.009(1) imposes an even more severe – and unequal – burden on Independents unlucky enough to run in a race for which there is a primary runoff: their petitioning period is cut short to just 30 days.  That is because the filing deadline for all Independents falls 30 days after the runoff primary, regardless of when the petitioning period starts.  *See* § 142.006.  Thus, in 2020, statewide Independents in races that did not have primary runoffs had 114 days to collect the 83,434 valid signatures they needed, while statewide Independents running in races that did have primary runoffs had just 30 days to obtain the same number of valid signatures.

Additionally, Texas does not provide any procedure by which Independents may retain ballot access.  *See* Verney Decl. ¶ 5.  Consequently, Independents must petition to qualify for the ballot in each election cycle – even if they received enough votes in the prior election to retain ballot access pursuant to § 181.005(c).  *See id.* An Independent who won the previous election is therefore still required to petition for ballot access as the incumbent office holder.

        **2.**    **Independent Presidential candidates in particular face additional severe burdens.**

Texas imposes the most severe and unequal burdens on presidential Independents.  Whereas statewide Independents (and NPPs) must obtain signatures equal in number to 1 percent of the last vote for Governor, *see* § 142.007, presidential Independents must obtain signatures equal in number to 1 percent of the last vote for President.  *See* § 192.032(d).  The latter

requirement is invariably significantly higher than the former.  In 2024, for example, a presidential Independent must obtain 113,151 signatures, whereas a statewide Independent in 2022 must obtain 83,434 signatures.  *See supra* at Part II.A.  In 2020, statewide Independents were required to obtain 83,434 signatures, while presidential Independents were required to obtain 89,692 signatures.[21]  In 2016, the requirement for statewide Independents was 47,183 signatures, while for presidential Independents it was 79,939 signatures.[22]

Texas also allows presidential Independents less time than statewide Independents (and NPPs) to obtain their signatures.  In 2020, for example, a presidential Independent had only 69 days, *see* §§ 192.032(c),(g), 41.007(c), whereas statewide Independents had 114 days (or only 30 days, if there were a runoff primary).  *See* §§ 142.004-06, 142.009, 202.007.  That is because presidential Independents may not circulate their petitions until after the presidential primary, but they must submit them by the second Monday in May, *see* §§ 192.032(c),(g), 41.007(c). *See Nader*, 332 F. Supp. 2d at 991-92 (acknowledging that Texas's deadline was the earliest in the nation).[23]

---

[21] *See* Hall Decl. ¶ 22; *compare* Hall Decl., Ex. 23 (reporting 8,343,443 total votes for Governor) *with* Hall Decl., Ex. 29 (reporting 8,969,226 total votes for President).

[22] *See* Hall Decl. ¶ 22; *compare* Hall Decl., Ex. 27 (reporting 4,718,268 total votes for Governor) *with* Hall Decl., Ex. 28 (reporting 7,993,851 total votes for President).

[23] This Court has previously upheld §§ 192.032(c) and (d), *see Nader*, 332 F. Supp. 2d at 992, but that decision does not control here for two reasons.  First, in *Nader*, the plaintiff asserted that these provisions were unconstitutional on the ground that they were more severe than the requirements for NPPs. *See id.*, at 985-86. The court concluded that they were not, *see id.* at 988, but did not address Plaintiffs' claim that the requirements for presidential Independents are unconstitutional under *Anderson* because they are more severe than the requirements for statewide Independents. *See Anderson*, 460 U.S. at 795. That claim remains valid. Second, *Nader* contains critical factual errors that undermine its rationale. In *Nader*, the Court found that an NPP's presidential candidate is subject to a January 2nd filing deadline, but that is incorrect. *See Nader*, 332 F. Supp. 2d at 989 (citing §§ 181.031-033). An NPP's presidential candidate is not subject to §§ 181.031-033, but is governed by an entirely different chapter of the Texas Election Code. *See* § 192.001 *et. seq.* The Court nonetheless relied on this erroneous finding to support its conclusion that a presidential Independent "enjoys more flexibility in determining whether to run than does the candidate of a minor political party." *Nader*, 332 F. Supp. 2d at 989. That is incorrect. An NPP's presidential candidate enjoys greater flexibility because that candidate is qualified for the ballot once the

By imposing more severe requirements on presidential Independents than statewide Independents, the Challenged Provisions are in violation of Supreme Court precedent. As the Court explained in *Anderson*:

> in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, *the State has a less important interest in regulating Presidential elections than statewide or local elections*, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson*, 460 U.S. at 795 (emphasis added and footnote omitted).  Courts thus recognize that, under *Anderson*, presidential ballot access requirements are subject to "'a different balance' than a restriction for state elections." *Green Party of Georgia*, 171 F. Supp. 3d at 1360, 1367-68 (citing cases); *see also Texas Independent Party v. Kirk*, 84 F.3d 178, 183 (5th Cir. 1996).

## IV.     The Challenged Provisions Are Not Narrowly Tailored to Serve Compelling State Interests

When election laws impose "severe" burdens, as the Challenged Provisions do, they must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (citation and quotation marks omitted). The Challenged Provisions fail that test on multiple grounds.  They are not narrowly tailored and, as the Secretary has conceded, certain provisions do not serve *any* legitimate state interest.  Accordingly, based on the uncontroverted record here, the Challenged Provisions cannot withstand scrutiny under the *Anderson-Burdick* analysis.

### A.     The Challenged Provisions Are Not Narrowly Tailored

In the history of American elections, since states began regulating access to the ballot, no state that has imposed a requirement of more than 5,000 signatures for statewide office has ever

---

party's state chair certifies it pursuant to § 192.031(3), whereas a presidential Independent must submit petitions with the required number of signatures much earlier, in May. *See* §§ 192.032(c),(d).  *Nader* is therefore inapposite here.

31

had more than eight candidates on the ballot. *See* Winger Report ¶¶ 17-18 & App. C. Texas's regulatory interests would not be implicated if eight candidates appeared on its general election ballot. *See Williams*, 393 U.S. at 47 (Harlan, J. concurring) (opining that "the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion."). Indeed, Texas frequently accommodates eight or more candidates on its presidential primary ballot without problem.[24] Other states do too. *See* Winger Report ¶ 15.[25]

The Supreme Court has acknowledged that "any fixed percentage requirement is necessarily arbitrary," in that a somewhat lower requirement might suffice as well as the state's chosen requirement. *American Party of Texas*, 415 U.S. at 783. At the same time, however, "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty," and consequently, "we have required that States adopt the least drastic means to achieve their ends." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) ("This requirement is particularly important where restrictions on access to the ballot are involved."). Here, Texas's signature requirements are greater, by orders of magnitude, than necessary to protect its legitimate regulatory interests. They are not narrowly tailored.

Likewise, the extreme time constraints that Texas imposes upon Independents and NPPs are wholly unnecessary to protect its legitimate regulatory interests. As a threshold matter, the majority of states do not impose any limit whatsoever on the time that NPPs have to obtain their

---

[24] *See* Hall Decl. ¶ 2; Hall Decl., Ex. 3 (listing eight candidates in 2016 Democratic primary); Ex. 4 (listing 13 candidates in 2016 Republican primary).

[25] Furthermore, until 1968 Texas did not impose any signature requirement at all upon NPPs but permitted them to place their nominees on the general election ballot simply by submitting their nominee lists to the Secretary. See TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968). Before that, Texas did not have a history of overcrowded ballots, voter confusion, or any other problems associated with NPPs' appearance on the general election ballot. See Hall Decl. ¶¶ 2-4; Ingram Dep. 68:9 – 77:18.

required signatures, and no state imposes the short petitioning periods and high signature requirements that Texas does. *See supra* at Part II.C. The Secretary cannot advance any legitimate interest that makes it necessary for Texas to do so.  *See* Ingram Dep. 188-17 – 192-14, 224-5 – 225-12.  Furthermore, Texas allows PP candidates to start collecting the signatures as early as they want, thus allowing them up to 2-1/2 years to meet their requirements.  *See* Ingram Dep. 82:10 – 83:5. Yet Independents and NPPs must wait until after primary election day to start collecting their signatures. The only justification for this unequal burden, the Secretary admits, is to prevent voters from being "confused" about whether they are eligible to vote in the primary if they have already signed a petition for an Independent or NPP. *See* Ingram Dep. 193:7 – 194:12. Yet the Secretary also admits that voters can be just as easily confused as to whether they are permitted to sign a petition after voting in the primary. *See id.*, at 194-14 – 194-24.  Texas has simply chosen, arbitrarily, to advantage PPs and to disadvantage Independents and NPPs.

The Secretary cannot show that Texas's filing deadlines are narrowly tailored to serve its legitimate regulatory interests. Every other state in the nation, except North Carolina, has a later filing deadline for presidential Independents, and there is nothing unusual about Texas's statutory scheme that makes its early filing deadline necessary. In fact, Texas expressly authorizes the Secretary to presume the validity of Independents' and NPPs' petitions, or to validate them by statistical sample. *See* §§ 141.065(b), 141.069. Thus, the two-month period that Texas provides the Secretary to validate the petitions is therefore excessive. *See* §§ 142.010(b), 181.007(b). Moreover, to the extent that the Secretary is burdened by the obligation to validate petitions in a timely fashion, that burden arises entirely from Texas's legislative choice to require that Independents and NPPs submit far more signatures than necessary to protect any legitimate regulatory interests.

Despite the Court's prior holding in connection with Plaintiffs' preliminary injunction motion (Dkt. No. 30 at 19), Plaintiffs respectfully submit that Section 141.041 likewise does not serve a compelling state interest. Even if Texas imposed no filing fee or petition requirement upon NPP candidates whatsoever – as it did for its entire history until 2019 – each NPP would be authorized to place no more than one candidate on the general election ballot for each office. Consequently, § 141.041 does nothing to protect the state's interests relating to the general election ballot. Instead, § 141.041 merely places restrictions on which candidates an NPP may consider for nomination at its convention.[26] Similarly, if § 141.041 is instead intended to ensure that candidates demonstrate a "modicum of support" before being eligible to seek an NPP's nomination, as the Secretary contends, *see* Ingram Dep. 39:10 – 39:12, it is especially ill-suited to advance that interest. Any candidate can satisfy § 141.041 by paying a filing fee. As *Bullock* and *Lubin* make clear, such a requirement does not advance the state's interest in limiting ballot access to "serious" candidates, because any wealthy candidates can pay them and non-wealthy candidates cannot.

Finally, as explained *supra* at Part III.F.2, Texas does not have any interest in imposing more severe requirements on presidential Independents than it does on statewide Independents. *See Anderson*, 460 U.S. at 795; *see also Texas Independent Party*, 84 F.3d at 183. Consequently, the higher signature requirement and earlier filing deadline that Texas imposes on presidential Independents are not narrowly tailored.

---

[26] Furthermore, because NPPs do not nominate by primary election, but by their own self-funded conventions, the state does not incur any cost in connection with their nominating processes. See Ingram Dep. 50:14 – 51:5. Yet, unlike the filing fees that Primary Party candidates pay pursuant to § 172.021(b), which the PPs retain and use to pay for their primary elections, see §§ 173.031, 173.032, the fees that NPPs pay pursuant to § 141.041 are retained by the Secretary and deposited in the state's general fund. See § 141.041(c). The Secretary does not and cannot assert any interest that can justify Texas in profiting, financially, from NPPs' participation in its elections. See Ingram Dep. 49:20 – 49:22.

## B.     Less Burdensome Alternatives Are Available to Protect Texas's Legitimate Regulatory Interests.

Texas could adopt lower signature requirements and allow Independents and NPPs longer petitioning periods and still protect its legitimate regulatory interests. Texas could also reduce the burdens imposed by the Challenged Provisions by updating the procedures that Independents and NPPs must follow, as it has done for PPs. Electronic petitioning platforms are available, which greatly alleviate the administrative burden and costs imposed by Texas's archaic paper-based procedures. *See* McReynolds Dec. ¶¶ 13-16. Both the District of Columbia and the State of Arizona have adopted such platforms.[27] *See id*. at 23; *see also* Arizona Secretary of State, *E-Qual*, https://apps.azsos.gov/equal/ (last visited Aug. 27, 2021) (Arizona's web-based petitioning platform). In addition to reducing the burden and cost of using paper nomination petitions, such platforms automatically validate voters' signatures, which would greatly reduce Independents' and NPPs costs by eliminating the need for them to collect more signatures than the requirement.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' summary judgment as to Count I and Count II of the Amended Complaint.

---

[27] Indeed, when the Covid-19 pandemic arose, many states adopted electronic petitioning procedures on short notice, either voluntarily or by court order. *See*, *e.g.*, *Libertarian Party of Il. v. Pritzker*, 455 F. Supp. 3d 738 (N.D. Ill. 2020) (requiring Illinois to adopt accept electronically signed petitions in 2020 election), *aff'd*, *Libertarian Party of Illinois v. Cadigan*, 824 Fed. Appx. 415 (7th Cir. 2020); *Green Party of Md. v. Hogan*, No. 1:20-cv-1253 (D. Md. June 19, 2020); *Goldstein v. Sec. of the Commonwealth*, 142 NE 3d 560 (Mass. 2020). None of these states reported any problems arising as a result of these new procedures. Texas could do the same here.

Dated: August 31, 2021

Respectfully submitted,


/s/Oliver B. Hall

David P. Whittlesey
State Bar No. 00791920
Jacob Fields (*Pro hac vice*)
**SHEARMAN & STERLING LLP**
300 West 6th Street, Suite 2250
Austin, TX 78701
Email: david.whittlesey@shearman.com
      jacob.fields@shearman.com
Tel: +1 (512) 647-1900
Fax: +1 (512) 647-1899

Christopher Ryan
*Pro hac vice*
Michael P. Mitchell
*Pro hac vice*
Anna Stockamore
*Pro hac vice*
**SHEARMAN & STERLING LLP**
401 9th St. N.W., Suite 800
Washington, D.C. 20004
Email: cryan@shearman.com
      michael.mitchell@shearman.com
      anna.stockamore@shearman.com
Tel: +1 (202) 508-8000
Fax: +1 (202) 508-8001

Oliver Hall
*Pro hac vice*
**CENTER FOR COMPETITIVE DEMOCRACY**
P.O. Box 21090
Washington, DC, 20009
Email: oliverhall@competitivedemocracy.org
Tel: +1 (202) 248-9294

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2021, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

/s/ Jacob Fields
Jacob Fields