IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MARK MILLER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:19-CV-700-RP |
| | § | |
| RUTH R. HUGHS, *in her official capacity as the* | § | |
| *Secretary of State of the State of Texas,* and | § | |
| JOSE A. ESPARZA, *in his official capacity as the* | § | |
| *Deputy Secretary of the State of Texas*, | § | |
| | § | |
| Defendants. | § | |

## AMENDED ORDER

Before the Court are Plaintiffs Mark Miller, Scott Copeland, Laura Palmer, Tom Kleven, Andy Prior ("the Individual Plaintiffs"), America's Party of Texas, Constitution Party of Texas, Green Party of Texas, and Libertarian Party of Texas's (collectively, the "Plaintiffs") Motion for Summary Judgment, (Dkt. 57), and Defendants Ruth R. Hughs, in her official capacity as the Secretary of State of the State of Texas, and Jose A. Esparza, in his official capacity as the Deputy Secretary of the State of Texas's (the "Defendants" or the "State") Motion for Summary Judgment, (Dkt. 58), and related responsive briefing. Having considered the parties' briefs, the record, and the relevant law, the Court will grant in part and deny in part Plaintiffs' motion for summary judgment and grant in part and deny in part Defendants' motion for summary judgment.[1]

## I. BACKGROUND

This case is about ballot access in Texas. Plaintiffs seek declaratory and injunctive relief alleging, in general terms, that the Texas Election Code imposes unconstitutional burdens on minor political parties and independent candidates while guaranteeing ballot access to "the two oldest and

---

[1] For clarity, this amended order corrects a typo in the first paragraph of the original order.

largest political parties." (Am. Compl., Dkt. 14, at 1). Plaintiffs filed their complaint against

Defendants on July 11, 2019, (Compl., Dkt. 1), followed by an amended complaint on July 25, 2019,

(Am. Compl., Dkt. 14). Plaintiffs filed their lawsuit shortly after the end of the 86th legislative

session and shortly before new changes to the Texas Election Code were scheduled to go into effect

in advance of the 2020 general election. (*See* Mot. Prelim. Inj., Dkt. 23, at 2).

Plaintiffs are individuals and political parties. The Individual Plaintiffs are voters and

potential candidates, including: Mark Miller ("Miller"), who is a registered voter and "wants to run

for office in future elections in Texas as an independent or nominee of a party that is required to

nominate candidates by convention"; Scott Copeland, who is a registered voter and chair of the

Constitution Party of Texas ("CPTX"); Laura Palmer, who is a registered voter and former co-chair

of the Green Party of Texas ("GPTX"); Tom Kleven, who is a registered voter and seeks to vote for

Third Parties; and Andy Prior, who is a registered voter, served as chair of America's Party of Texas

("APTX"), and "attempted to run for Land Commissioner in 2018 as a nominee of APTX, but

APTX lacked the resources necessary to conduct a successful petition drive, and it did not qualify

for ballot access." (*Id.* at 2–4). CPTX, GPTX, and APTX are also plaintiffs in the suit, as well as the

Libertarian Party of Texas ("LPTX"). (*Id.* at 4–5).

On October 10, 2019, Plaintiffs filed a motion for preliminary injunction, (Dkt. 23), which

the Court heard on October 31, 2019, (Minute Entry, Dkt. 28), and denied on November 25, 2019,

(Order, Dkt. 30). In that same Order, the Court also denied Defendants' motion to dismiss, (Dkt.

16). (*Id.*). Defendants filed an answer, (Dkt. 31), to the amended complaint, and the Court set a

scheduling order, (Dkt. 34), which was later amended several times, (Dkts. 38, 41, 43, 48, 50). The

parties filed the cross motions for summary judgment currently before this Court. Defendants also

moved to strike portions of Plaintiffs' summary judgment evidence, (Dkt. 78), a dispute which was

eventually resolved by the parties, (Dkt. 88).

### A.      Statutory Framework

Before addressing the facts developed in this case, the Court sets out the statutory framework under the Texas Election Code that governs ballot access in Texas. The State began regulating ballot access in 1903, including placing requirements on independent candidates. (Pls. Statement of Facts, Dkt. 59, at 4). In 1968, the State extended those requirements to third parties. (*Id.*). Since then, the State has expanded the requirements into the current statutory scheme regulating ballot access in Texas that Plaintiffs claim violates their constitutional rights by imposing severe and unequal burdens on their First and Fourteenth Amendments.

Under the Texas Election Code, there are three ways for a candidate to obtain a place on the statewide general election ballot: (1) win a primary election, (2) receive a nomination from a political party that nominates by convention and qualifies for ballot access, or (3) submit a nominating petition signed by the required number of voters. (Defs. Mot. Summ. J., Dkt. 57, at 8).

### 1.      Major Parties

Political parties that received at least 20% of the vote in the last gubernatorial election ("Major Parties") nominate their candidates for state and county government and Congress by primary election. *See* Tex. Elec. Code § 172.001. Since 1900, only the Democratic Party and Republican Party have qualified as Major Parties under Section 172.001. (Pls. Statement of Facts, Dkt. 59, at 7). Candidates seeking to run in a primary election must submit an application to the state or county chair, depending on the office, in December of the year before the election and pay a filing fee or submit a nomination petition. Tex. Elec. Code §§ 172.116, .117(a), .120(a), .120(h), .122. Filing fees range from $75 to $5000. *Id.* § 172.024. If a candidate instead chooses to submit a nomination petition, the candidate must collect from 500 to 5,000 signatures. *Id.* § 172.025.

2.    **Minor Parties**

Political parties that are new or did not receive at least 2% of the total vote cast for governor at least once in the five previous general elections must nominate their candidates by convention ("Minor Parties"). *See* Tex. Elec. Code §§ 172.002, 181.002, 181.003. Minor Parties that intend to nominate by convention must register with the Secretary of State by January 2 of the election year. *Id.* § 181.0041. Candidates who intend to seek a Minor Party's nomination must file a notarized application in December of the year before the election. *Id.* §§ 141.031, 172.023(a), 181.031–33. The nominating conventions are held after the primary election in either March or April depending on the office sought. *Id.* §§ 41.007(a), 181.061(a),(b),(c). To place a nominee on the general election ballot, a Minor Party must file precinct convention participant lists—within 75 days of the precinct convention date—with the Secretary of State that contain participants equal in number to at least 1% of the total vote for governor in the preceding general election. *See id.* § 181.005(a). A participant is eligible if she is a registered voter or resident of the precinct who is eligible to vote who has not voted in a primary election or attended the convention of another party in the same election year. *See id.* §§ 162.001, 162.003, 162.012, 162.014, 181.065, 112.002–04. No Minor Party has qualified for the ballot pursuant to Section 181.005(a) in at least 50 years. (Pls. Statement of Facts, Dkt. 59, at 9).

If a Minor Party's participant list lacks the required number of participants, then the Minor Party must file nomination petitions—within the same 75-day period—that contain a sufficient number of valid signatures to make up for the shortfall. *See* Tex. Elec. Code §§ 181.006(a),(b). A voter may not sign a nomination petition until after the primary election, a provision often referred to as a primary screenout. *See id.* §§ 162.001, 162.003, 162.012, 162.014, 181.006(g),(j). Additionally, there are restrictions on who may sign the petition. Voters may not sign the petition if they voted in the primary election, and voters may not sign a Minor Party's nomination petition if they participated in another party's convention or signed another party's petition. *See id.* §§ 162.001,

162.003, 162.012, 162.014, 181.006(g),(j). If a voter chooses to sign a petition, the voter must include

their address, date of birth or voter registration number, printed name, date, and typically the county

they are registered to vote in. *Id.* § 141.063(a)(2).

Additionally, the person collecting the signature, often called a petition circulator, must read

aloud the following oath to each potential signer:

> I know that the purpose of this petition is to entitle the _____ Party to have
> its nominees placed on the ballot in the general election for state and county officers.
> I have not voted in a primary election or participated in a convention of another
> party during this voting year, and I understand that I become ineligible to do so by
> signing this petition. I understand that signing more than one petition to entitle a
> party to have its nominees placed on the general election ballot in the same election
> is prohibited.

*Id.* §§ 181.006(f), 141.064. Before filing the petition, the petition circulator must take several steps.

The circulator must witness each signature, confirm that the date of signing is correct, verify each

signer's registration status, and confirm that each registration number entered on the petition is

correct. *Id.* § 141.064. Circulators must also execute an affidavit stating they complied with the

requirements and believe each signature is genuine and the corresponding information correct. *Id.* §

141.065.

Once the petitions are submitted, the Secretary of the State has about two months to certify

a Minor Party's nominees, specifically up until 68 days before the general election. *See id.* §§

142.010(b), 181.007(b), 192.033(b). The certification is for one election cycle only, and the Minor

Party does not retain ballot access unless one of its candidates for statewide office receives at least

2% of the vote in at least one of the five previous general elections.[2] *Id.* § 181.005(c). Without 2% of

the vote, Minor Parties must go through the petition process again in the next election cycle to

qualify for the ballot.

---

[2] Prior to amendment in 2019, Texas required one Minor Party candidate for statewide office to receive at least 5% of the vote in the previous election. *See* Tex. Elec. Code § 181.005(b); Pls. Statement of Facts, Dkt. 59, at 10).

In 2019, Texas amended the statutory scheme to impose a new requirement on Minor Parties, under Section 141.041 of the Texas Election Code, one that is symmetrical with a requirement imposed on Major Parties. Section 141.041 states that to appear on the general election ballot, candidates must either pay a filing fee or submit a nomination petition that complies with Section 141.062 and is signed by a specific number of eligible voters. *Id.* § 141.041(a). These requirements are the same imposed on Major Party candidates. *Id.* § 141.041(b),(c); 172.024-25.

### 3. Independents

Candidates who are not affiliated with a political party ("Independents") may access the ballot through a procedure that is similar to that following by Minor Parties, except that Independents may not nominate by convention and must submit nomination petitions signed by eligible voters. Independents must file a declaration of intent in December of the year before the election. Tex. Elec. Code § 142.002. They must file an application and a nomination petition that contains valid signatures equal in number to 1% of the total vote for governor in the preceding election. *Id.* §§ 142.004, 142.007. In 2020, that meant Independents needed to obtain 83,717 valid signatures. (Am. Compl., Dkt. 14, at 14). Independents seeking state office must submit their nomination petitions by the 30th day after the runoff primary election day, but they may not circulate them until after the primary election or runoff primary election. *Id.* §§ 142.004–06, 142.009, 202.007. In 2020, Independents seeking state office had either 30 days or 114 days to collect signatures, depending on whether a runoff primary took place. (Am. Compl., Dkt. 14, at 14). Like Minor Party candidates, Independents cannot obtain signatures until after the primary election, or runoff when applicable. Tex. Elec. Code § 142.009. An Independent candidate's nomination petitions and the signatures on the petitions are subject to the same requirements as Minor Parties' petitions and signatures. *Id.* §§ 141.062-66.

Additionally, the petition circulator must read aloud the following oath to each potential signer:

> I know the purpose of this petition. I have not voted in a primary election or runoff primary election of any political party that has nominated, at either election, a candidate for the office of _____ for which _____ is a candidate.

*Id.* §§ 141.064, 142.008.

Independent candidates for president also must file an application and nomination petition, and their signature requirement is equal to at least 1% of the total vote for president in Texas in the preceding presidential election. *See id.* §§ 192.032(a),(b),(d). In 2020, that translated to 89,692 valid signatures. (Am. Compl., Dkt. 14, at 15). Independent candidates for president must file their application no later than the second Monday in May of the presidential year. *Id.* §§ 192.032(c),(g); 41.007(c). Independent candidates running for president cannot circulate their petition until after the presidential primary in March, *id.* §§ 192.032(g), 41.007(c), which translated to 69 days to collect signatures in 2020, (Pls. Statement of Facts, Dkt. 59, at 11).

### B.   The Challenged Provisions' Impacts on Plaintiffs

### 1.   The Facts Before the Court

In their cross-motions for summary judgment, the parties do not contest the facts before the Court on summary judgment, and it is largely Plaintiffs who present a record to the Court.[3] Along with their motion for summary judgment, Plaintiffs filed a Statement of Undisputed Material Facts, (Dkt. 59), on which the Court relies to evaluate the effect of the Texas Election Code on Plaintiffs' ballot access. Attached to Plaintiffs' Statement of Undisputed Material Facts are many declarations, (Dkts. 60-72), one expert report, (Dkt. 73), and a transcript of a deposition, (Dkt. 74).[4] Finally, the

---

[3] Defendants do provide deposition transcripts for APTX, CPTX, LPTX, GPTX, and Keith Ingram, corporate representative of Defendants. (*See* Appendix, Dkt. 57-1).

[4] For ease of reference, the Court often refers directly to the Statement of Undisputed Material Facts, rather than each individual underlying document.

State filed a motion to strike portions of Plaintiffs' summary judgment evidence. (Dkt. 78). After the parties had briefed the motion, they filed a Joint Notice of Resolved Issues Raised in Defendants' Objections to Plaintiffs' Summary Judgment Evidence and Motion to Strike, (Dkt. 88). In that notice, the parties stated that they conferred about the State's objections and, after conferring, the State agreed to withdraw their objections and Plaintiffs agreed to redact portions of the evidence, specifically related to Oliver Hall's declaration and documents attached to that declaration. (*Id.*). Pursuant to the parties' agreement and this Court's order on January 28, 2022, for Oliver Hall's declaration and exhibit, the Court only considers his substituted declaration and the exhibit attached to it. (Dkts. 90, 90-1, 90-2).

2.   **History of Texas Ballots Containing Minor Party and Independent Candidates**

From 1903, when Texas began regulating access to the ballot, to 1967, when Texas began requiring Minor Parties to collect signatures, Texas's general election ballots were not overcrowded. (Pls. Statement of Facts, Dkt. 59, at 5). The peak was in 1908 when five Minor Parties—Populist, Prohibition, Socialist, Socialist Labor, and Independence League parties—appeared on the general election ballot in the presidential race. (*Id.*). A maximum of four Minor Party candidates for governor appeared in five of thirty-three gubernatorial elections during that same time period. (*Id.*). Similarly, in senate elections held during that period, Minor Parties had two candidates on the ballot five times. (*Id.*). For some elections, no Minor Party fielded a candidate for governor or senator. (*Id.*).

Since 1967, Minor Parties and Independent candidates have qualified for the ballot. Among Minor Parties, LPTX, New Alliance Party, Reform Party, and GPTX all have fielded a candidate on the general election ballot. (*Id.* at 6). Among Independent candidates, several have qualified to appear on the ballot as presidential candidates, including John Anderson (1980), Lyndon LaRouche, Jr. (1984), and Ross Perot (1992). (*Id.*). For the governor's race, two Independent candidates

qualified in 2006: Carole Strayhorn and Kinky Friedman. (*Id.*). Since then, no statewide Independent candidate has qualified for the general election ballot. (*Id.* at 7). To illustrate the difficulties faced by Independent candidates, Plaintiffs present the 2018 ballot as an example when 8 out of 70 *i*ndependent candidates—for statewide and district office—qualified to appear on the ballot meaning that 88.6% failed to qualify. (*Id.*).

>        **3.**      **Current Impact of Texas's Ballot Access Statutory Scheme**

This year, in 2022, Texas's 1% signature requirement amounts to 83,434 valid signatures for Minor Parties and Independents. (Pls. Statement of Facts, Dkt. 59, at 12). In 2024, it will be 113,151 signatures for Independent presidential candidates. (*Id.*). Texas's signature number requirement is higher than every other state except California. (*Id.*). To ensure they can meet the verification thresholds, Minor Parties and Independents collect signatures "far in excess of the number of valid signatures actually required." (*Id.*). Texas is one of 10 states that imposes a time limitation for collecting signatures, and Texas's time limitation is the most restrictive, with the window in Arkansas being longer at 90 days, Wisconsin five or six months, Kansas and Michigan six months, and the rest one year or longer. (*Id.*).

Gathering signatures is costly and time consuming. (*Id.* at 13). After printing the petition forms at their own expense, Minor Parties and independents can rely on volunteers to collect signatures or hire trained petition circulators. Volunteers are less effective, tending to be slower and unable to work more than a few hours at a time. (*Id.*). Since about 1980, almost all volunteer-led petition drives have failed. (*Id.*). In the last 20 years, no statewide Minor Party or Independent candidate has had a successful petition drive without paid petition circulators. (*Id.*).

Plaintiffs assert that statewide Minor Party and Independent candidates must hire paid petition circulators. (*Id.*). Circulators can collect about 10 signatures per hour on average, with a validity rate of approximately 70% which translates to 400 signatures—280 of which will be deemed

valid on average—per 40-hour work week. (*Id.*). Petition circulators typically charge per signature. (*Id.*). In 2018, the cost was $587,500, assuming there was no primary runoff. (*Id.*). A paid petition drive in 2022 will cost a statewide Minor Party or Independent candidate between $882,000 and $1.375 million. (*Id.* at 13–14).

Another challenge is that Texas is the only state that prohibits Minor Parties and Independents from collecting signatures before the primary election and on the day of the primary election, as well as prohibits voters from signing petitions if they voted in a primary election. (*Id.* at 14). The day of the primary election is considered "by far the most productive day" in other states. (*Id.*). Not being able to collect on primary day makes petitioning more difficult in Texas. (*Id.*). Petition circulators consider Texas to be the most difficult state in which to conduct a successful petition drive given the number requirement and the timing restraints. (*Id.*).

Even with petition circulators, petition drives face obstacles. Plaintiffs point out that finding suitable voters is challenging given that there must be foot traffic and voters willing to stop in public and provide their signatures and personal information, plus local officials and property owners are sometimes unaware of petition circulators' right to collect signatures and adversaries or others sometimes sabotage petitions with ineligible or fraudulent names. (*Id.*). Once an eligible, or seemingly eligible, voter stops and is willing to share personal information, the voter also must listen to the circulator recite the oath, which adds delay and "often intimidates or otherwise dissuades voters from signing." (*Id.* at 15). After collecting signatures, a petition circulator reviews the signatures and must execute a notarized affidavit attesting that they have verified each person's voter registration status and believe the signatures are genuine and the other information collected is correct. (*Id.*).

Executing a petition drive on paper presents additional challenges. Using a paper form, "circulators have no practicable methos of confirming, in real time, that potential signers are

eligible," for example that they live in the correct jurisdiction and have not voted in the primary election or signed a nomination petition for another candidate or party. (*Id.* at 14–15). Sometimes the signer's handwriting is illegible, resulting in more signatures that cannot be verified and creating the need to collect additional signatures to compensate for those that cannot be verified. (*Id.* at 15). After the drive, Minor Parties and Independents must collect the petitions from the circulators and review them for compliance, which means organizing many boxes filled with petitions (each petition sheet has room for ten signatures). (*Id.*). The final step is to deliver the boxes of petitions "by truck or van" to Defendants' office in Austin. (*Id.*). Other states have implemented electronic methods by which voters can sign nomination petitions and simultaneously confirm eligibility. (*Id.* at 15).

### 4.   Plaintiffs' and Independents' Experiences Complying or Attempting to Comply with the Challenged Ballot Access Provisions

According to Plaintiffs, the challenges outlined above burden Minor Parties, Independents, and their supporters, including the Individual Plaintiffs, and "have prevented [them] from being able to fully participate in Texas's electoral process." (Pls. Mot. Summ. J., Dkt. 58, at 20). The Court begins with the experience of APTX, a small Minor Party. APTX does not have a website, take membership dues, or have a way to track membership. (APTX Depo., Dkt. 57-1, at 6). APTX has had one statewide convention which 10 people attended and about five donors total since it began in 2009. (*Id.* at 6, 9). APTX has less than $1,000 in its bank account because it does "not have any expense[s] that would require a budget." (*Id.* at 12). APTX has never qualified for the ballot in Texas "because it lacks the financial resources necessary to conduct a successful petition drive." (Pls. Statement of Facts, Dkt. 59, at 18). In 2018, APTX leaders looked into hiring petition circulators but ultimately decided against it after the "lowest price quote" translated to a total cost of at least $500,000. (*Id.*). APTX "lacks sufficient funds to pay even a fraction of that amount." (*Id.*). APTX instead organized an all-volunteer petition drive and collected only a few thousand signatures, falling far short of the 47,182 required signatures. (*Id.*). During recent elections, APTX members told party

leaders that they have decided to join or vote for a different party because APTX is not on the ballot and that they will not run for office as an APTX nominee because they would not appear on the ballot. (*Id.*).

Similarly, CPTX lacks the money and resources needed to complete a successful petition drive. (*Id.* at 19). CPX has about 130 members and has two expenses: its website and email service. (CPTX Depo., Dkt. 57-1, at 21, 23). CPTX has not attempted a petition drive, volunteer or paid. (*Id.* at 25). CPTX advises its nominees to run as independents in down-ballot races which have lower signature requirements. (Pls. Statement of Facts, Dkt. 59, at 19). According to Plaintiffs, "CPTX's exclusion from the ballot has hampered its ability to fundraise, recruit new members, and participate in public debates and other political events." (*Id.*).

In the last 20 years or so, GPTX has had varying success accessing the ballot and currently has ballot access. After failing to qualify for the ballot in 2004, 2006, and 2008, GPTX qualified in 2010 "by accepting an in-kind contribution of approximately 90,000 nomination petition signatures, which were delivered by a professional petition circulating firm." (*Id.* at 16). In response, the Texas Democratic Party sued GPTX, subjecting GPTX to litigation even though GPTX had not retained the petition circulators or paid them. (*Id.*). From 2010 until 2018, GPTX retained ballot access "by running candidates that received a sufficient number of votes to meet the 5% threshold." (*Id.*). For 2018, GPTX needed to submit 47,183 valid signatures in 75 days. (*Id.*). GPTX laced the resources to pay for a petition drive or organize a volunteer petition drive. (*Id.*). Instead, GPTX told its members to seek ballot access as independent candidates for state or local races, which have lower signature requirements. (*Id.*). For 2020, GPTX candidates were "unable to comply on short notice with the new requirements imposed by § 141.041" of the Texas Election Code. (*Id.* at 17). Ultimately, seven GPTX candidates appeared on the 2020 general election ballot after the Supreme Court of Texas "held that § 141.041 had been improperly enforced." (*Id.*). GPTX has lost members and supporters

"who become discouraged and disillusioned by the ongoing need to conduct petition drives that exhaust the party's resources but still fall short of legal requirements." (*Id.*). Those members leave to join a party that has ballot access or vote for Democratic candidates, and "even GPTX's most ardent and loyal members are often unwilling to run for office as GPTX's nominees, because they will not appear on the ballot." (*Id.*).

LPTX has maintained ballot access since 1998, except in 2002. (LPTX Depo., Dkt. 57-1, at 37). Although LPTX lacks the financial resources necessary to hire petition circulators, LPTX "focuses its time and resources on running candidates for as many statewide offices as possible." (Pls. Statement of Facts, Dkt. 59, at 17). Focusing on only those races harms its "ability to engage in political speech for the purpose of spreading its message and influencing public debate." (*Id.* at 18). At the same time, however, LPTX admitted that LPTX "needs to make sure its candidates do well during any given election cycle . . . regardless of the ballot provisions in the Texas Election Code." (LPTX Depo., Dkt. 57-1, at 37). If LPTX fails to retain ballot access, it will not be able to qualify again because it would be too costly to conduct a successful petition drive. (Pls. Statement of Facts, Dkt. 59, at 18). Also, in 2020, Wes Benedict attempted to seek the nomination as the LPTX senate candidate. (*Id.*). He was unable to pay the $5,000 filing fee or submit a petition with 5,000 valid signatures by the deadline and withdrew his nomination application. (*Id.*).

Independent candidates, including Plaintiff Mark Miller, face obstacles trying to appear on the general election ballot. After appearing on the ballot as LPTX's nominee for Railroad Commissioner, Miller considered creating a new political party but "chose not to pursue this alternative because the necessity of registering a new party by January 2 of the election year and the high cost of conducting a statewide petition drive made such an effort impracticable if not actually impossible unless the prospective party could raise hundreds of thousands of dollars in funding." (*Id.* at 19). Danny Harrison, who wanted to run for governor as an Independent, had no means to

collect 47,183 valid signatures and chose not to run. (*Id.*). No statewide Independent candidate has qualified for the general election ballot since 2006. (*Id.*).

Finally, the challenged provisions can impact voters. Plaintiffs' political views are not adequately represented by the Major Parties or the Minor Parties that do appear on the ballot. (*Id.* at 20–21). Voters, including Plaintiffs, have a desire to vote for candidates who represent a wider range of views, and the "exclusion of such candidates from the ballot denies these voters the opportunity to vote for candidates nominated by the [Minor] Party that best represents their views and diminishes their ability to choose." (*Id.* at 21).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party does not bear the ultimate burden of proof, after it has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). When the

movant bears the burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Cross-motions for summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

### III. DISCUSSION

#### A.    *Anderson-Burdick* Framework

While states may regulate elections, that authority is not absolute given the fundamental significance of voting in our constitutional system. In the Fifth Circuit, the test for evaluating the constitutionality of laws regulating ballot access is the *Anderson-Burdick* test.[5] Under that test, a court

---

[5] Both sides agree that the *Anderson-Burdick* framework applies in this case. (Pls. Mot. Summ. J., Dkt. 58, at 22–23; Defs. Mot. Summ. J., Dkt. 57, at 15–17).

first considers the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). That is weighed against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* "The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Provisions that "impose 'severe restrictions' . . . must be 'narrowly drawn' and support 'compelling' state interests, whereas 'reasonable, nondiscriminatory restrictions' require only 'important regulatory interests' to pass constitutional muster." *Meyer v. Texas*, No. H-10-3860, 2011 WL 1806524, at *3 (quoting *Burdick*, 504 U.S. at 434). After weighing those factors, the court can decide whether the challenged provisions are unconstitutional. *Anderson*, 460 U.S. at 789.

While the parties generally agree on how the *Anderson-Burdick* test applies in ballot access cases, they disagree whether the Supreme Court's decision in *American Party of Texas v. White*, 415 U.S. 767 (1974), controls. Since *American Party of Texas* was decided before *Anderson* and *Burdick*, Plaintiffs argue the later, more stringent test set out in *Anderson* and *Burdick* controls, not *American Party of Texas*. The State disagrees, noting that the Supreme Court has not cast doubt on *American Party of Texas* and has continued to cite the case favorably. This Court expresses no opinion on whether *American Party of Texas* controls as it does not alter the outcome here.

### B.    Whether Plaintiffs Launch a Facial Attack on the Challenged Provisions

In its opposition to Plaintiffs' motion for summary judgment, the State contends Plaintiffs "attempt to cast their lawsuit as both a facial and 'as applied' challenge to the ballot access requirements Texas law places on 'non-primary parties.'" (Defs. Resp., Dkt. 79, at 1). To support that contention, the State quotes a sentence from Plaintiffs' motion for summary judgment: "The

Challenged Provisions impose many additional burdens that fall on Independents and [Minor Parties] alone, and place them at a significant disadvantage to [Major Parties]." (*Id.* at 2). The State argues that Plaintiffs "'essentially assert the facial unconstitutionality'" of the requirement by challenging the provisions "for both themselves and other [Minor Parties]." (*Id.*) (quoting *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). The State attempts to drag Plaintiffs' claims into the zone of a facial attack to hold Plaintiffs' claims to a higher standard, (*id.*), but Plaintiffs' pleadings make an as-applied challenge. For example, in their amended complaint, Plaintiffs assert that the challenged provisions "as applied in conjunction with one another . . . violate rights guaranteed to Plaintiffs." (Am. Compl., Dkt. 14, at 30). For declaratory relief, Plaintiffs ask this Court to declare the challenged provisions are "unconstitutional as applied to Plaintiffs" and to enjoin the State "from enforcing the Challenged Provisions as applied to Plaintiffs." (*Id.* at 30). Plaintiffs do not seek relief for any non-party, and the Court does not construe Plaintiffs' claims as a facial challenge.

### C.     The Character of the Burdens Placed on Plaintiffs' Rights

Plaintiffs "developed a comprehensive evidentiary record" in an attempt to demonstrate that the challenged provisions make it "prohibitively difficult and expensive" for Minor Parties and Independents to access the ballot in Texas. (Pls. Mot. Summ. J., Dkt 58, at 26). Plaintiffs argue those burdens—viewed in isolation or cumulatively—impose severe and unequal burdens on Plaintiffs' First and Fourteenth Amendment rights. The Court will step through each burden or set of burdens.

### 1.     Number of Required Signatures

Plaintiffs argue that the number of signatures they are required to collect to appear on the ballot imposes a severe burden. To qualify for the general election ballot in Texas, a statewide Minor Party or Independent candidate must submit valid signatures totaling 1% of all votes cast in the most recent gubernatorial election and 1% of all votes cast for president in Texas in the most recent presidential election. Tex. Elec. Code §§ 142.007(1), 192.032(d). In 2020, that amounted to 83,434

valid signatures, and in 2024, it will be 113,151 valid signatures. (Pls. Statement of Facts, Dkt. 59, at 12). Plaintiffs have shown that in practice they must collect many more signatures because 30-50% of the signatures collected are later deemed invalid. (*Id*.). The number is higher than what any other state requires, other than California. (*Id*.). Courts have compared signature requirements between states and that comparison has played a role in determining whether a state's numerical requirements are severely burdensome. *See Williams v. Rhodes*, 393 U.S. 23, 47 & n.10 (1968) (Harlan, J. concurring) (comparing Ohio's requirement to "the overwhelming majority of other States" and finding it "clearly disproportionate to the magnitude of the risk that [Ohio] may properly act to prevent"); *Lee v. Keith*, 463 F.3d 763, 768–69 (7th Cir. 2006) (finding Illinois's requirement "severe" in part because it "exceeds those of all other states"); *Graveline v. Benson*, 992 F.3d 524, 540 (6th Cir. 2021) (finding Michigan's requirement "severe" in part because "in terms of absolute numbers only five states have higher requirements").

While Texas's ballot access provisions may impose more of a burden than other states with its numerical requirement, Plaintiffs' evidence fails to show that the requirement is severely burdensome. First, LPTX and GPTX currently have ballot access in Texas, negating Plaintiffs' claim that the 1% requirement is overly stringent. LPTX and GPTX have surmounted that obstacle and have done so for a period of years. LPTX only has needed to collect signatures once in the last 20 years to appear on the ballot, and their petition drive was successful. (LPTX Depo., Dkt. 57-1, at 37). In the last 12 years, GPTX needed signatures in 2010, and 92,000 signatures were collected by paid circulators as an in-kind donation to GPTX. (GPTX Depo., Dkt. 57-1, at 51; Pls. Statement of Facts, Dkt. 59, at 16). GPTX did not make an attempt to be on the ballot in 2018 because it "lacked the financial and other resources necessary to conduct a successful petition drive." (Pls. Statement of Facts, Dkt. 59, at 16). Otherwise, GPTX has appeared on the ballot, including in 2020, and will appear on the 2022 ballot. Despite the fact that GPTX has and will appear on the ballot, Plaintiffs

argue that the challenged provisions still "pose an existential threat" because should they fail to retain ballot access, they "have no realistic chance of qualifying again." (Pls. Reply, Dkt. 83, at 10) (citing Pls. Statement of Facts, Dkt. 59, at 16–17). While the Court acknowledges the uncertainty faced by Plaintiffs, the fact remains that LPTX and GPTX currently have access to the ballot and that access has been fairly consistent for years. In this instance, the Court will not find that the burden imposed qualifies as severe when the thrust of the burden is theoretical and speculative. Finally, Plaintiffs point out that GPTX would not have appeared on the 2020 ballot but for Texas enacting a new law in 2019 "seemingly in an attempt to influence this litigation" that re-qualified GPTX based on its 2016 electoral results. (Pls. Reply, Dkt. 83, at 11). Texas may have enacted the law in an attempt to influence this litigation. Whatever the motivation behind the law, the new law reduced the burden on GPTX and made it easier for GPTX to appear on the ballot. Thus, the change in law does not support Plaintiffs' claim.

Second, APTX and CPTX, which lack ballot access, have not shown that the numerical requirement burdens their parties. Neither APTX nor CPTX is a flourishing party. APTX does not have a website, take membership dues, or have a way to track membership. (APTX Depo., Dkt. 57-1, at 6). APTX has had one statewide convention which 10 people attended and about five donors total since it began in 2009. (*Id.* at 6, 9). APTX has less than $1,000 in its bank account because it "does not have any expenses that would require a budget." (*Id.* at 12). When APTX attempted an all-volunteer petition drive, APTX collected just a few thousand signatures, well short of the 47,182 required signatures. (Pls. Statement of Facts, Dkt. 59, at 18). Similarly, CPTX lacks the money and resources needed to complete a successful petition drive. (*Id.* at 19). CPX has about 130 members and has two expenses: its website and email service. (CPTX Depo., Dkt. 57-1, at 21, 23). Importantly, CPTX has not attempted a petition drive, volunteer or paid. (*Id.* at 25). APTX and CPTX do not have robust support nor have they made genuine efforts to gain that support, and

they have failed to show that it is the statutory burden of collecting signatures that prevents them from appearing on the ballot. Similarly, the burden on voters who wish to vote for APTX or CPTX candidates and cannot do so is by virtue of that party failing to make real efforts to meet the requirements. In this case, any burden on voters tracks the burden on Minor Parties.  Because LPTX and GPTX have ballot access and APTX and CPTX have not shown more than a hypothetical burden, the Court finds that the 1% requirement is not severely burdensome based on the facts presented to this Court today.

### 2.      Cost of Obtaining Signatures

The thrust of Plaintiffs' argument is that they must hire professional petition circulators to obtain an adequate number of signatures to meet the statutory requirement. Plaintiffs have shown that volunteer petition drives are rarely successful, (Pls. Statement of Facts, Dkt. 59, at 13), and that in the last two decades no Minor Party or Independent has successfully completed a petition drive without "spending substantial sums to hire paid petition circulators," (*id.*). Plaintiffs rely on *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966), and *Bullock v. Carter*, 405 U.S. 134 (1972), to support their notion that the financial burdens associated with collecting signatures impose a severe burden on their rights. Those cases are not directly applicable because they involved statutorily-mandated fees, specifically a poll tax and excessive filing fees. *Harper*, 383 U.S. at 666; *Bullock*, 405 U.S. at 134. Plaintiffs' argument is more nuanced, however. Plaintiffs contend that although there is no statutory requirement to pay petition circulators, the practical effect of the challenged provisions is that Plaintiffs must hire petition circulators to run a successful petition drive. In response, the State counters that it is not "impossible" to gain ballot access using a volunteer-led petition drive. (Def. Resp., Dkt. 79, at 7).

The law lays somewhere in between Plaintiffs' and the State's characterizations. Plaintiffs in a ballot access case are not required to show that a statute makes it impossible to gain ballot access.

On the other hand, plaintiffs do need to demonstrate a serious, consequential burden. For example, in *Libertarian Party of Kentucky v. Grimes*, the Sixth Circuit explained that Kentucky's ballot access laws "may impose some financial costs" because they "may require greater campaign efforts," the statutory scheme did not exclude or virtually exclude Minor Parties from the ballot. 835 F.3d 570, 575 (6th Cir. 2016) ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). That court also noted that the challenged provision was only one of two mechanisms to access the ballot, much like the statutory scheme in Texas which allows for Minor Parties to access the ballot through a petition drive or filing fee. While this Court understands Plaintiffs' analogy to mandatory fees like in *Harper* and *Bullock* and finds it initially compelling, the Court finds that Plaintiffs cannot get there at this time. The evidence in this case does not show that the State is impermissibly conditioning Plaintiffs' participation in the electoral process on their financial status. LPTX and GPTX currently have ballot access, and APTX and CPTX lack the kind of support needed to genuinely launch a petition drive. Plaintiffs also proffer that to qualify for the 2022 ballot, the Serve America Movement Party obtained proposals from three petitioning firms that ranged from $882,000 to $1.375 million, but the Serve America Movement Party is not a party to this lawsuit. Plaintiffs make a good case that it is expensive, perhaps prohibitively expensive, to comply with the petition requirement, but none of the Plaintiffs is suffering from that burden, even if it is a severe burden.

### 3.   Time Constraints

Plaintiffs argue that the "extreme" time constraints placed on Plaintiffs to obtain signatures severely burdens their rights. (Pls. Mot. Summ. J., Dkt. 58, at 31). Under the current statutory scheme, Minor Parties have 75 days and statewide Independents have 107 days. *See* Tex. Elec. Code §§ 181.005(a), 142.004-06, 142.009. If there's a primary runoff, Independents would have only 30 days. *See id.* § 142.009(1). In 2024, presidential Independents will have 68 days. *See* §§ 192.032(c),(g);

41.007(c). Texas's time constraints in combination with the number of signatures required is more restrictive than other states. The time constraints may be the most restrictive in the country given the numerical requirement, but Plaintiffs fail to present adequate evidence that the time constraints burden them. Instead, Plaintiffs simply argue that the time period remains fixed while the number of required signatures increases with each election cycle. (Pls. Mot. Summ. J., Dkt. 58, at 31–32). The Court cannot find that the time constraints impose severe burdens on Plaintiffs.

### 4.    Petitioning Procedures

Plaintiffs take issue with the various requirements imposed on petition signers and circulators and the process itself: collecting signatures by hand, attempting to collect signatures in public, requesting detailed personal information in public, reciting the required oath to potential signers, the primary screenout which means signatures cannot be collected until after the primary election, and the petition circulator affidavit that verifies the signatures are genuine and personal information correct. (Pls. Mot. Summ. J., Dkt. 58, at 32–35). As it relates to the primary screenout, Plaintiffs have shown that Texas is the only state that prohibits Minor Parties and Independents from collecting signatures before the primary election and prohibits voters from signing petitions if they voted in a primary election. (Pls. Statement of Facts, Dkt. 59, at 14). The primary screenout makes petitioning more difficult in Texas. (*Id.*). Plaintiffs present sufficient evidence that stopping people in public places and asking them to provide persona information adds challenges because petition circulators are often asked to relocate and some voters are unwilling to stop in public and provide personal information. (*Id.* at 14). Likewise, Plaintiffs' evidence establishes that the oath, paper forms, and affidavit dissuade voters from signing, make the process more time consuming, and create the need for more signatures. (*Id.* at 15). Whereas other states have implemented online petitions for voters to sign, Texas has not done so. (*Id.*). The Court again does not disagree that the inability to use online petitions may burden Plaintiffs and indeed finds that the lack of electronic

methods does burden Plaintiffs. Yet again, though, Plaintiffs fail to tie the restrictions to evidence of the severe burdens placed specifically on them, or, if they did, it was a plaintiff that already had ballot access. For example, a member of LPTX submitted a detailed declaration documenting how the petition process is "extraordinarily laborious and expensive" and how the primary screenout "lowers your overall signature validity rate." (Benedict Decl., Dkt. 69, at 6–7). To the extent LPTX members could demonstrate that these provisions impose burdens, LPTX is not burdened enough to be excluded from the ballot in Texas.

### 5.      Newly-Enacted Section 141.041

Finally, Plaintiffs urge the Court to find that Section 141.041 of the Texas Election Code imposes substantial additional burdens on Plaintiffs. In 2019, this Court declined to preliminarily enjoin enforcement of that provision's requirement that a candidate pay a filing fee or meet the petition requirements of Sections 141.041(e) and 141.062. (Order, Dkt. 30). Although the provision allows a candidate to pay a fee or submit a petition, Plaintiffs argue it has excluded "non-wealthy candidates and their supporters." (Pls. Mot. Summ. J., Dkt. 58, at 35). Specifically, in support of their claim, Plaintiffs state that LPTX candidates were excluded in 2020 and cite Wes Benedict's ("Benedict") declaration, (Dkt. 69). (Pls. Mot. Summ. J., Dkt. 58, at 36).

In his declaration, Benedict says he attempted to seek the LPTX nomination for U.S. Senate, which, pursuant to Section 141.041, meant he needed to pay the $5,000 filing fee or submit a petition with 5,000 valid signatures by December 9, 2019. (Benedict Decl., Dkt. 69, at 8). He attempted to raise funds but only raised about $500. (*Id.*). According to Benedict, potential supporters were unwilling to donate "when they did not even know whether I would be the party's nominee." (*Id.*). Then Benedict explains that another LPTX candidate paid the filing fee "so it would be a waste of LPTX's supporters' money to help pay my filing fee." (*Id.*). In his next sentence, Benedict concludes: "As a result, I withdrew my application for LPTX's nomination as a candidate

for U.S. Senate." (*Id.*). His declaration does not support Plaintiffs' claim that Section 141.041 severely burdens their right to access the ballot. Rather, Benedict's declaration shows he chose not to pursue the party's nomination in part because another LPTX candidate already qualified for the ballot. Without more, Plaintiffs have not presented evidence that Section 141.041 imposes severe burdens on them.

### D.       State Interests

Next, the Court evaluates the State's interest in imposing the challenged restrictions. The State says it has an interest in ensuring candidates demonstrate a significant modicum of support before gaining access to the ballot. (Defs. Resp., Dkt. 79, at 10). The State's interest "helps to avoid voter confusion, ballot overcrowding, and frivolous candidacies." (*Id.*). In the face of Plaintiffs' failure to show that the challenged provisions—even taken together—impose severe burdens, the Court finds that the State's stated interest is sufficient to meet rational basis review, save for one set of rules governing ballot access.

The provisions governing nominating petitions in Texas that require the petition to be printed on paper and signed in person and by hand impose a burden on Plaintiffs that is not reasonably related to the State's interest in ensuring candidates demonstrate a significant modicum of support to qualify for the ballot. *See, e.g.,* Tex. Elec. Code § 141.063(b) (requiring that the signer's signature be in their "own handwriting"). The State's goals of avoiding voter confusion, ballot overcrowding, and frivolous candidacies are not served by requiring Minor Parties and Independents to use an inefficient and laborious process that includes printing paper petitions at their own expense, sending petition drive volunteers or paid workers out to public spaces to request that people stop and go through a paper form at a time and in a place that may be inconvenient or uncomfortable, making it impractical to confirm, in real time, whether a potential signer is eligible, reducing the number of valid signatures because sometimes the signer's handwriting is illegible or

becomes illegible as the paper is handled, collecting the printed and signed petitions at their own expense from the circulators, organizing the paper petitions, reviewing the paper petitions by hand, and then driving the boxes of petition forms to Austin. (*See* Pls. Statement of Facts, Dkt. 59, at 14–15). Indeed, other states have implemented electronic methods by which voters can sign nomination petitions and simultaneously confirm eligibility. (*Id.* at 15). Plaintiffs have shown that electronic methods would reduce or eliminate much of the burden imposed on Minor Parties and Independents. For example, CPTX state chair Scott Copeland stated: "If Texas authorized electronic petitioning procedures, such as a secure web-based portal or petition circulation by email, CPTX would focus our outreach efforts on social media platforms such as Facebook and Twitter, which cost nothing and enable us to reach a large number of supporters and other voters who may be receptive to our platform and message." (Copeland Decl., Dkt. 66, at 2). The Court therefore holds that the challenged provisions, to the extent they require paper petitions, violate Plaintiffs' fundamental rights because there is no connection between those burdensome provisions and the Defendants' stated interest.

### E.    Unequal Burdens

Plaintiffs next challenge Texas's ballot access laws as violating the Equal Protection Clause because they operate as a "de facto financial barrier to Independents' and [Minor Parties'] participation in Texas's electoral process, while the alternative path available to [Major Parties] guarantees their nominees automatic access to the general election ballot at taxpayer expense." (Pls. Mot. Summ. J., Dkt. 58, at 36). First, alternate ballot access rules for Major Parties and Minor Parties are not per se unconstitutional. *Jenness v. Fortson*, 403 U.S. 431, 441–42 (1970) ("[T]here are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different

routes to the printed ballot."). States may impose different requirements on Minor Parties. Second, in Texas, appearing on the ballot is not conditioned on being able to pay a fee. A candidate may pay the filing fee or submit a petition, which furthers the State's proffered interest in limiting ballot access to serious candidates who have demonstrated public support. Third, the same issue plagues this claim that doomed almost all of Plaintiffs' claim that the challenged provisions burden their fundamental rights—Plaintiffs have not shown that the challenged provisions "operate as a mechanism to exclude certain classes of candidates from the electoral process." *Anderson*, 460 U.S. at 793. Fourth, the Fifth Circuit and other district courts in Texas have recognized that many parts of Texas's ballot access scheme pass constitutional muster even though they affect Major Parties, Minor Parties, and Independents differently. *See, e.g.*, *Nader v. Connor*, 332 F. Supp. 2d 982, 988–89 (W.D. Tex.), *aff'd*, 388 F.3d 137 (5th Cir. 2004); *Kirk*, 84 F.3d at 184–86; *Meyer*, 2011 WL 1806524, at *3–5. For these reasons, Plaintiffs' Equal Protection Clause claim fails in most respects.

While most of the statutory scheme does not run afoul of the Equal Protection Clause, one aspect of the challenged provisions does impose unequal burdens on Plaintiffs. Plaintiffs have shown that Texas places an unequal burden on Plaintiffs because they cannot use electronic methods for petitioning whereas Texas allows Major Parties to use electronic methods as part of their procedures for accessing the ballot. Pursuant to Section 172.029 of the Texas Election Code, state and county chairs for the Major Parties "shall electronically submit" information about each candidate who files an application for a place on the ballot. Tex. Elec. Code § 172.029(a). Defendants must "continuously maintain an online database" of the information submitted. *Id.* § 172.029(b). Defendants are also directed to adopt rules surrounding the electronic submissions. *See id.* § 172.029(b),(e). Texas also allows Major Parties to certify primary election results electronically. *See* §§ 172.116, 172.117(a), 172.122. Plaintiffs have no ability to electronically conduct petitioning, verify signatures, or submit petitions. Instead, Plaintiffs use the same hard copy paper procedures

enacted almost 120 years ago in 1903. Defendants also have not taken any steps to reduce the burdens those procedures impose on Minor Parties and Independents. (Ingram Depo., Dkt. 74, at 216–17). In fact, Defendants have not "considered any measures that would reduce the burden and expense of the petitioning process" including adopting electronic procedures. (*Id.* at 214, 216–17). When asked whether electronic procedures, such as enabling signatures to be validated as a petition was signed, would reduce the administrative burden on Defendants too, Defendants admitted that it "[c]onceivably" would. (*Id.* at 215). Validating them by paper takes Defendants up to one to two weeks. (*Id.*). If the "circulator's affidavit was electronically filled in and verified and the signature was automatically filled in and verified," Defendants admitted they "completely agree[d]" that "it could cut the process short" and reduce their burden. (*Id.* at 216). Because Major Parties can retrieve and transmit information online, requiring Minor Parties and Independents to conduct the petitioning process on paper imposes an unequal burden on Plaintiffs.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' Motion for Summary Judgment, (Dkt. 57), is **GRANTED IN PART** and **DENIED IN PART** and Plaintiffs' Motion for Summary Judgment, (Dkt. 58), is **GRANTED IN PART** and **DENIED IN PART**.

Defendants' motion for summary is granted and Plaintiffs' motion for summary judgment denied except for the Court's holdings that (1) the challenged provisions, to the extent they require paper petitions, violate Plaintiffs' fundamental rights and (2) the challenged provisions, to the extent they require a paper petitioning process, impose unequal burdens on Plaintiffs in violation of the Equal Protection Clause.

**IT IS FURTHER ORDERED** that the parties shall meaningfully confer and submit a joint and agreed proposed order on or before **October 14, 2022** that sets out the appropriate relief based on this Order. **IT IS FINALLY ORDERED** that if the parties meaningfully confer and are

unable to reach an agreement, the parties shall file simultaneous briefs of no more than ten pages **on or before October 21, 2022** that set out how they believe the relief should be fashioned based on this Order. If the parties file briefs, the parties also shall attach a proposed order.

      **SIGNED** on October 4, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE